FOOD CITY, INC., Appellant,

v.

FLEMING COMPANIES, INC., Appellee.

No. 16125.

Court of Civil Appeals of Texas, San Antonio.

Oct. 31, 1979.

Walter W. Church, Kampmann, Church, Burns & Clark, San Antonio, for appellant.

Richard B. Moore, Douglas W. Becker, Gresham, Davis, Gregory, Worthy & Moore, San Antonio, for appellee.

KLINGEMAN, Justice.

This is a suit by Food City, Inc. (Food City) against Fleming Companies, Inc. (Fleming) to require Fleming to deliver to Food City certain equipment and fixtures, or, alternatively, for damages if such fixtures and equipment had been sold to a third party. The case involves a dispute between a first lien holder and a subordinate lien holder over title to equipment and fixtures in Garrett's. United Super (Garretts), a grocery store located in San Antonio. Fleming was the owner of a first lien on all of the fixtures, equipment, inventory, accounts receivable and contract rights of Garrett's. Food City held a second lien solely on the fixtures and equipment of the same grocery store. Fleming took steps to repossess and dispose of Fleming's collateral and these proceedings form the crux of this litigation.

The court after a non-jury trial entered judgment that Food City take nothing against Fleming.

Food City was the original owner of the store in question and wished to sell the store to its employees, the Garretts. In the spring of 1976, the Garretts approached Fleming to secure financing. After a study of the store's potential in the grocery market, Fleming determined that it would assume the lease of the premises, sublet the store to the Garretts, and advance to the Garretts $370,000 with which it could purchase equipment, fixtures, and grocery inventory from Food City. This advance was secured by a security agreement in the equipment and fixtures, inventory, contract rights and accounts of the store, and Fleming filed appropriate financing statements to perfect its security interest with the Secretary of State and the County Clerk of Bexar County.

At some point during the negotiations, Food City indicated that it wanted $50,000 more than the amount that Fleming was willing to advance to the Garretts to accomplish the transaction. After Fleming had loaned $370,000 to the Garretts and had procured security documentation on that loan and all future advances, Food City was released on the store lease. Fleming thereafter subleased the premises to the Garretts. Sometime after this occurred the Garretts executed a note for the $50,000, payable to Food City, along with a security

agreement granting a lien to Food City on the fixtures in the store. The Garretts also executed another note for $80,000 to Food City which was unknown to Fleming and which was unsecured. At trial each party introduced conflicting evidence as to whether or not it was known by Fleming that the $50,000 note from Garrett's to Food City would be secured by a subordinate lien on equipment and fixtures in the store. Representatives of Fleming testified that they knew nothing about the second lien of Food City and insisted that they had a security interest in the collateral free and clear of any other security interest as required by Fleming's financing documents.

In sworn answers to interrogatories Food City admitted that it had not sent copies of the security agreements, notes or other pertinent documents to Fleming.

In late October or November, 1976, the Garretts became delinquent on their open account to Fleming for food purchases. Deeming itself insecure as to the collectability of future advances and the underlying note obligation, Fleming sent a demand to the Garretts on November 16, 1976, instructing them to turn over all secured collateral for foreclosure. The following day, Fleming and the Garretts reached an agreement whereby the Garretts agreed to the foreclosure, waived notice of sale, and agreed to a foreclosure sale price of $248,-232 to be credited against the amount owed to Fleming. The Garretts, after consulting their attorney, signed an agreement to this effect.

Prior to entering into this agreement, Fleming searched county and state records to determine whether any other creditors had filed financing statements indexed in the name of the Garretts, as debtors, and none were found. Fleming also claimed at this time that it had received no notices from any parties claiming to have a security interest in the collateral.

The total debt owing to Fleming on the date of the foreclosure was almost $430,000.

Fleming bid $248,232 for the collateral on the date of the foreclosure, November 17, 1976, based on fair market value of the inventory of $148,232, and an estimated fair market value for the fixtures of $100,000. After deducting expenses of sale, the net worth of the collateral was $187,907.63.

On December 1, 1976, Food City sent a letter to the Garretts and Fleming stating that the Garretts were in default under their security agreement and requesting that the equipment be set aside for sale at the store location (3903 Eisenhauer Road). Food City's representative and their attorney met on the parking lot at the store location on December 11, 1976, and purported to buy the equipment and fixtures located in the store by bidding the outstanding balance of the $50,000 note.

Food City filed suit against Fleming on December 14, 1976, demanding the possession of the equipment and fixtures at the store or, in the alternative, the sum of $56,752. Food City did not, either before or after filing this suit, attempt to redeem collateral from Fleming by tendering to Fleming the full amount of its secured debt and expenses allowable under Fleming's security agreement.

Food City asserts forty points of error which, for this opinion, will be discussed under the following general categories: (1) Merger; (2) Notice, Good Faith and Commercial Reasonableness; and (3) Damages.

The trial court made extensive findings of fact and conclusions of law. Many of those are attacked by Food City. Only those deemed pertinent to this opinion will be summarized and discussed under the general categories listed above.

## MERGER

Food City's claim for relief is primarily predicated upon its contention that Fleming, by taking a conveyance of the fixtures and equipment from the Garretts and thereafter releasing the Garretts from any further liability for a deficiency, effected a merger of its first lien into the fee title ownership and thereby elevated Food City's second lien to first lien status. In support of this contention, Food City asserts that it is clear from the ownership laws of the

State of Texas that when an ownership interest and a lien interest merge the ownership interest, being the primary and superior interest, will take over the other interest and leave an ownership interest only.

■ It is true that in some instances where the title to land and title to a mortgage lien become vested in the same person the greater and lesser estate may become merged and the lien extinguished. However, there are exceptions to this rule. See *R. B. Spencer & Co. v. May,* 78 S.W.2d 665 (Tex.Civ.App.—Waco 1935, writ ref'd). The applicable rule is set forth in *North Texas Building & Loan Ass'n v. Overton,* 126 Tex. 104, 86 S.W.2d 738, 740 (1935), as follows:

Whenever, by reason of the existence of a junior incumbrance, it is to the interest of the mortgagee to keep the estates separate, they will not be regarded as merged. It has been many times stated that the intention of the mortgagee is the determining factor. In this state that rule, in its literal meaning, is inaccurate, for it is presumed, as a matter of law, that he intended to keep the estates separate, if that course is essential to maintain his priority over a junior incumbrancer. (Citations omitted.) It is immaterial, as between the senior and junior lienholders, whether the mortgagee retains the note and mortgage in his possession or surrenders them to the mortgagor. It is likewise immaterial whether or not the deed of conveyance from the mortgagor to the mortgagee recites, as did the one in the instant case, that the cancellation of the note and mortgage was a part of the consideration for the conveyance.

It is often true, as no doubt it was in the instant case, that it is decidedly to the advantage of the mortgagor and mortgagee to avoid the necessity of a foreclosure suit by a conveyance of the premises to the mortgagee. A rule penalizing them for so doing would be contrary to our policy that litigation is not to be encouraged. The junior lienholder suffers no injury thereby, but is in the same position as if there had been a foreclosure without his having been made a party. His equity of redemption is not affected, neither is his lien thereby elevated to a first lien.

■ Fleming contends that the doctrine of merger is of no assistance to Food City either under the provisions of the Texas Business & Commerce Code or the case law of this State. It asserts that it has fully complied with both the provisions of Sections 9.504 and 9.505 of the Texas Business & Commerce Code (hereinafter referred to by section number only) with regard to disposition of collateral after default, and the trial court so found. Fleming maintains, that irrespective of whether one considers the disposition of the collateral as a foreclosure under Section 9.504 or an acceptance of collateral as a discharge of obligation under Section 9.505, the results are the same and that Food City's subordinate interest was not elevated to a first lien but rather was extinguished.

Section 9.504(d) provides that "When collateral is disposed of by a secured party after default, the disposition transfers to a purchaser for value all of the debtor's rights therein, discharges the security interest under which it is made and any security interest or lien subordinate thereto." Tex. Bus. & Com.Code Ann. § 9.504(d) (Vernon Supp.1978–79).

The doctrine of merger does not support Food City's claim for relief.[1]

---

1. The trial court made certain findings of fact which are pertinent to the question of merger, some of which findings also pertain to notice, commercial reasonableness, and good faith. Such findings of fact may be summarized as follows:

(1) On November 16, 1976, Fleming gave written notice to the Garretts that they were in default under the terms of Fleming's security agreements and that the entire balance due was being accelerated and asked that Fleming be given possession of the collateral.

(2) On November 16, 1976, Fleming sent a notice to the Garretts proposing that if the Garretts would waive notice of sale, let Fleming foreclose its security interest in the collateral and retain the same after sale, then Fleming would release the Garretts from further liability on their debt to Fleming.

(3) The total amount owed by the Garretts to Fleming on November 17, 1976, and secured by security interests in equipment, fix-

## GOOD FAITH, COMMERCIAL REASON-ABLENESS AND NOTICE

The trial court made a number of findings of fact with regard to notice, good faith and commercial reasonableness, which may be summarized as follows:

(a) The Garretts did not inform Fleming, either orally or in writing, that the Garretts had granted Food City a security interest in the store equipment.

(b) Food City did not inform Fleming, either orally or in writing, that Food City had been granted a security interest in the store equipment until December 1, 1976.

(c) Fleming did not receive notice of a claim or interest in the store equipment from Food City until December 1, 1976.

(d) Food City failed to file a financing statement covering the equipment and fixtures at the store with either the Secretary of State or the Bexar County Clerk on or prior to November 17, 1976.

(e) Fleming's security agreement expressly provided that the Garretts could not permit any other liens or encumbrances to attach to the collateral without the written consent of Fleming and Fleming never gave any such consent.

(f) Fleming's financing documentation was duly executed by Garretts, as debtors, and Fleming's security interest was duly perfected on June 15, 1976, by the filing of financing statements with the Secretary of State of Texas and the County Clerk of Bexar County, Texas.

(g) Fleming searched its files to determine whether or not any notices had been received from secured parties claiming an interest in the equipment and fixtures at the store. They found that none had been received.

(h) Fleming was not aware that the Garretts gave Food City a second lien on the equipment at the store to secure a $50,000 note.

(i) After foreclosure Fleming attempted to sell the store with its equipment, fixtures and inventory in place to other grocery retailers in the South Texas area in an effort to get the highest possible price for the collateral.

(j) Fleming placed additional groceries in the store, advertised the inventory in local newspapers and employed store personnel in order to sell the inventory for the highest possible price.

(k) Fleming's sales of the store inventory, equipment and fixtures were in conformity with reasonable commercial practices among dealers in this type of property and the prices received were equal to or greater than the current fair market value of the inventory, equipment and fixtures as of the times of the sales and as of November 17, 1976.

Under the provisions of Section 9.504, Fleming had the right, after default, to sell, lease, or otherwise dispose of any or all of the collateral. In addition, under Section 9.505 Fleming had the right to retain the collateral in satisfaction of its debts. Section 9.501(a) provides that the rights of a secured party in possession of collateral are cumulative. There is no necessity for the secured party to elect between remedies; it may take any permitted action or combinations of actions. 51 Tex. Jur.2d § 288, at 577 (1963). *Pruske v. National Bank of Commerce of San Antonio*, 533 S.W.2d 931 (Tex.Civ.App.—San Antonio 1976, no writ).

tures, inventory, accounts, and contract rights in the store was $429,148.77.

(4) On November 17, 1976, the Garretts surrendered the collateral to Fleming, acknowledged the validity of the secured debts owed to Fleming, waived notice prerequisite to the holding of a foreclosure sale and agreed that Fleming's bid of $248,232 against the secured debt for the collateral was fair and constituted a commercially reasonable sale.

(5) On November 17, 1976, Fleming foreclosed the security interest, purchased the collateral having bid $248,232 against the secured debt and agreed to release the Garretts from any further liability in exchange for the Garretts' agreement to allow Fleming to retain the collateral in satisfaction of all obligations; Fleming acted in good faith in taking such actions.

■ Under Section 9.505 the secured party must send notice in writing to debtor when he proposes to retain collateral. However, a debtor's right to notice and to object may be waived if, after default, he has signed a statement renouncing or modifying his rights. In a transaction secured by consumer goods no other notice need be sent. In other transactions, notice must also be sent to any other secured party from whom the secured party has received a written notice of a claim of interest in the same collateral before the notice was sent to the debtor and before the debtor renounced his rights thereunder. It is undisputed that Food City did not timely file any financing statement with regard to the Garretts' indebtedness with either the Bexar County Clerk or the Secretary of State. It is also undisputed that Food City did not send any written notice to Fleming that it was claiming an interest in the store equipment until after the time the debtor renounced and released his interest in the property and after the time that Fleming had taken possession of the collateral under the provisions of Sections 9.504 and 9.505.

■ Under Texas law, whether disposition of collateral is commercially reasonable is a question of fact. *Pruske v. National Bank of Commerce of San Antonio, supra. Christian v. First National Bank of Weatherford,* 531 S.W.2d 832, 838 (Tex.Civ.App.— Fort Worth 1975, writ ref'd n. r. e.). Evidence in the record before us reveals that Fleming made a bona fide effort to ascertain whether or not there were any secured creditors entitled to notification that Fleming planned to hold a foreclosure sale of the collateral and determined that there were no such creditors entitled to notice; and, that, after receiving the debtor's waiver of interest in the collateral, Fleming made a bona fide effort to obtain the highest possible price for the collateral. The trial court's finding that Fleming's disposition of the property was commercially reasonable is amply supported by the evidence. The trial court correctly concluded that Fleming's disposition of the collateral was made in good faith and was in all respects commercially reasonable.

The Code places the burden of requesting notice upon the subordinate secured party. This request must occur before the debtor renounces his own rights to notification. Coogan, *The New UCC Article 9,* 86 Harv. L.Rev. 477–519 (1973). *See* Funk, *The Proposed Revision of Article 9 of the Uniform Commercial Code,* 27 The Business Lawyer 321 (1971); Program by The Committee on the Uniform Commercial Code of the ABA Section of Corporation, Banking & Business Law, *Impact of 1972 Revisions on Secured Financing Transactions Under UCC Article 9,* 33 The Business Lawyer 2491 (1978).

■ Food City makes no contention that it timely filed its security interest. It concedes that it did not timely send Fleming a written notice of any claim or interest in the collateral, and that it did not send Fleming a written request for notice of any disposal of the collateral. Food City's basic contention pertinent to notice is that there were certain documents in Fleming's file which should have put them on notice of its claim. Two of these documents were copies of insurance binders purchased by the Garretts to insure the grocery store reflecting both Fleming and Food City as "loss payees" for the period predating the transfer of title from Food City to the Garretts. A third document, a computerized "accounts payable summary", contains a notation "notes payable equipment . . . $50,000" with no particular reference to Food City or the existence of any security interest of Food City on any equipment. A fourth document is a letter from Fleming's San Antonio manager recommending that Fleming finance the Garretts' purchase of the property. This letter, however, makes no reference to any lien being taken by Food City as part of the transaction. The fifth document, upon which Food City chiefly relies, is a bill of sale given by Food City to the Garretts and found in Fleming's file on December 1, 1976, after the foreclosure had taken place. This document inconspicuously refers to a second lien by Food City in small print, and contains no reference to what collateral was secured by it.

The trial court in its findings of fact indicates that none of such documents would place Fleming on notice of Food City's second lien.

Food City could have protected itself by (1) duly filing a financing statement in the offices of the Secretary of State or of the County Clerk of Bexar County; (2) timely sending a notice to Fleming specifically asserting a subordinate interest in the collateral and requesting notification prior to any sale or disposition of the property. Food City did neither.

The trial court correctly held that Fleming timely gave notice of its intended disposition of the collateral to all persons entitled to such notice in accordance with the provisions of the Texas Business & Commerce Code.

## DAMAGES

Section 9.507(a) provides that if the collateral has been disposed of without compliance with the provisions of this subchapter the debtor or any person entitled to notification or whose security interest has been made known to the secured party prior to disposition has the right to recover for any loss sustained as a result of the wrongful disposition. Although we have already held that there was not a wrongful disposition, for the purpose of discussing the question of damages, we will assume such a wrongful disposition.

The trial court found that the sale of the collateral was commercially reasonable and we have upheld this finding. There is authority to the effect that a trier of the fact having found that a sale is commercially reasonable is entitled to infer that the total amount received at the sale was evidence of the fair market value of the property sold. *United States v. Whitehead Plastics,* 501 F.2d 692 (5th Cir. 1974) *cert. denied,* 421 U.S. 912, 95 S.Ct. 1566, 43 L.Ed.2d 7. Here we need not rely on such inference. The trial court found that the total amount owed by the Garretts to Flem-

ing on November 17, 1976, on its secured first lien was $429,148.77; that the inventory was sold for a gross amount of $118,-752.78; that reasonable expenses of sale were $21,843.15, leaving a net realization from inventory of $96,909.63; that the unsatisfied amount of Fleming's debt after giving credit for the sale of inventory was $332,239.14; that the fair market value of fixtures and equipment was $90,100; that Fleming realized $75,995 from sale of part of the equipment and fixtures with the fair market value of the remaining equipment being $15,000; that the unsatisfied amount of Fleming's claim against the equipment and fixtures after giving credit for the fair market value of all the collateral foreclosed upon was $242,139.14; and, that Food City did not suffer any loss caused by Fleming's action in disposing of the collateral.

Representatives of both parties and one independent witness testified as to their opinions on the value of the store fixtures, equipment and inventory. After a review of such testimony, we have concluded that there is ample evidence to support the trial court's findings that the fair market value of the collateral was considerably less than the amount of Fleming's first lien indebtedness and that Fleming suffered a substantial loss in the entire transaction. The evidence fails to show that Food City sustained any loss or damages by reason of failure to receive proper notice of the sale of the property. Under Section 9.507(a), the recovery of damages is measured by the economic loss sustained by reason of a failure to comply with the provisions of such subchapter.[2] There is no proof that Food City suffered any such loss.

The trial court also concluded that Food City waived any right it had to redeem the collateral, and that Food City was equitably estopped, by reason of its own actions, to complain of Fleming's failure to send notice to Food City of the disposition of collateral. In view of our previous holding, we deem it unnecessary to discuss or pass on the question of waiver or estoppel.

---

2. The assumption of lack of proper notice or of any failure to comply with the applicable provi-

sions of the Code is made for the purpose of discussing the question of damages only.

**762**

The trial court's material findings of fact are sufficiently supported by the evidence. The trial court correctly held that (1) Fleming was not aware of Food City's subordinate interest in the equipment and fixtures; (2) Food City did not give the type of written notice to Fleming asserting its subordinate claim against the equipment and fixtures required by the Texas Business and Commerce Code; (3) Food City suffered no loss by the disposition of the property because the amount of Fleming's first lien against the inventory, equipment and fixtures was greater than the value of the collateral; (4) the interest of Fleming in the collateral did not become subordinate to the claim of Food City under the doctrine of merger; and (5) Fleming acted in good faith and in a commercially reasonable manner in proceeding as it did.

We have considered all of Food City's points of error and all are overruled. The judgment of the trial court is affirmed.