WILLIAM J. MCGOWEN AND MARILYN MCGOWEN, APPELLEES
AND CROSS-APPELLANTS, V. NEBRASKA STATE BANK, A NEBRASKA
BANKING CORPORATION, APPELLANT AND CROSS-APPELLEE.

427 N.W.2d 772

Filed August 12, 1988. No. 86-923.

Daniel L. Hartnett, of Crary, Huff, Clem, Raby & Inkster, P.C., for appellant.

E. Terry Sibbernsen and Debra R. Nickels, of Welsh & Sibbernsen, for appellees.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

WHITE, J.

This case involves a dispute between a senior secured creditor, Nebraska State Bank (hereafter NSB), and a junior lienholder, William and Marilyn McGowen, both NSB and McGowens having secured interests in certain cattle owned by debtor/farmer Paul High. The McGowens filed a petition in the district court for Dakota County alleging that NSB had wrongfully converted certain livestock in which the McGowens held a perfected security interest.

Pursuant to a stipulation of the parties, the trial was bifurcated on the issue of liability and the issue of damages. The trial was before a jury, and most of the evidence was presented

by stipulation. The stipulated facts are as follows. On or about October 8, 1980, the McGowens sold to Paul High various items of personal property and livestock. An exact list of these items was incorporated into a purchase agreement dated October 8, 1980. In that agreement High granted the McGowens a security interest in that personal property and livestock.

On December 18, 1980, High granted to NSB, as consideration for a promissory note in the amount of $86,695.76 executed on that date, a security interest in all his farm products, including but not limited to all of his livestock, i.e., all of his cattle, hogs, etc. By September 5, 1984, High's total indebtedness to NSB apparently amounted to $372,341.95.

NSB perfected its security interest by filing a financing statement with the county clerk in Dakota County on December 20, 1980. The McGowens perfected their security interest by filing a financing statement and security agreement with the county clerk on April 28, 1981.

High defaulted on the purchase agreement entered into with the McGowens and also defaulted on his obligations to NSB. In September of 1984, NSB repossessed and sold 97 head of cattle owned by High. The cattle were sold on September 25, 1984, at Bleil-Chapman Livestock Auction Company in Moville, Iowa, for a total sales price of $28,956.01, with net proceeds of $27,872.29 after expenses. After application of the cattle sale proceeds, and other proceeds not involved in this suit, to High's debt to NSB, the remaining obligation amounted to $314,046.46.

NSB had notice and knowledge of the McGowen security interest from and after March 1984. On September 25, 1984, the date of repossession and sale of the cattle, each of the parties to this suit had a valid and existing security interest in the repossessed collateral.

It was further stipulated that at no time prior to the sale of the cattle did NSB give notice of the repossession or sale to the McGowens. Neb. U.C.C. § 9-504(3) (Reissue 1980) requires a secured creditor to notify "any other secured party" of the intended disposition of repossessed collateral, except in certain

circumstances not applicable to this case.

Following the reading of the stipulated facts to the jury, plaintiffs-appellees, McGowens, moved for a directed verdict on the issue of liability. The court sustained the motion and found, as a matter of law, that NSB failed to give notification of the sale to the McGowens, as required by law.

The only issue submitted to the jury and the only issue before this court on appeal is that of damages. We note that the liability issue (whether notice was required) could have been subject to dispute; however, appellant does not raise the question. Defendant-appellant stipulated away the exceptions to the notice requirement found in § 9-504(3). These exceptions at least raised a question as to whether NSB was required to give notice to the McGowens. Since appellant does not raise the issue, we will not address it, especially in light of this court's rule that a party cannot be heard to complain of error which the party was instrumental in bringing about. *First West Side Bank v. Hiddleston*, 225 Neb. 563, 407 N.W.2d 170 (1987).

The questions presented on appeal require this court to address a narrow issue relating to the measure of damages in cases involving the "any loss" provision of Neb. U.C.C. § 9-507(1) (Reissue 1980). Section 9-507(1) provides, in relevant part:

> If the disposition has occurred the debtor or any person entitled to notification or whose security interest has been made known to the secured party prior to the disposition has a *right to recover* from the secured party *any loss* caused by a failure to comply with the provisions of this part.

(Emphasis supplied.)

Following the court's finding of liability on the part of NSB, the issue of damages was submitted to the jury. Evidence was presented to the jury on the issue of "whether or not [the McGowens] sustained any loss or any damage as a result of the failure [of NSB to give notice], and if they did, the amount of such loss." At the close of all the evidence the jury was instructed by the court, deliberated, and returned a verdict in favor of the McGowens in the amount of $14,000.

At trial and on appeal, McGowens argue that they were

damaged by the failure of notice because they were deprived of the profit they could have realized by buying the livestock themselves at the sale and subsequently reselling it at a higher price. William McGowen testified at trial that the cattle, which sold for $28,956, were in fact worth approximately $50,000. McGowen testified as an expert based on some 30 years' experience as a farmer engaged in raising and selling cattle and pigs. In his opinion, auctions are generally used as a quick way to get rid of cattle and do not produce the best price when selling a herd. McGowen testified that if he had been notified of the sale, he would have tried "[t]o stop the sale . . . and if I couldn't do that I would have tried to buy them back."

The court instructed the jury on plaintiffs' theory of the damages issue. The instruction read in part:

> The plaintiffs claim that by reason of not receiving notice, they were deprived of the opportunity to attend the sale and purchase the cattle, claiming that they were worth more than the sale price, and that they could have made an advantageous purchase, and that they were therefore damaged to the extent of the profit they could have made.

Appellant, NSB, argues that the "any loss" provision of § 9-507(1) must be read in conjunction with Neb. U.C.C. § 9-312 (Cum. Supp. 1984) and § 9-504, the result being that the McGowens have, as a matter of law, sustained no loss. We agree with appellant's position.

As appellant points out, § 9-507(1) does not exist in a vacuum. That section must be read with reference to the other provisions of Neb. U.C.C. art. 9 (Reissue 1980 & Cum. Supp. 1984). Statutes relating to the same subject are in pari materia and should be construed together. *Northwest High School Dist. No. 82 v. Hessel*, 210 Neb. 219, 313 N.W.2d 656 (1981).

Section 9-312(5) contains the first-to-file rule governing priority between conflicting security interests in the same collateral. A fundamental rule of article 9 and its notice filing system is that when a conflict exists between security interests in the same collateral, and the security interests were perfected by filing, the first in time to file a financing statement has priority. *North Platte State Bank v. Production Credit Assn.*, 189 Neb. 44, 200 N.W.2d 1 (1972).

Section 9-504(1) establishes the order in which proceeds are distributed upon the disposition of collateral pledged under article 9. Section 9-504(1) establishes that

[t]he proceeds of disposition shall be applied in the order following to

(a) the reasonable expenses of retaking, holding, preparing for sale or lease, selling, leasing, and the like and, to the extent provided for in the agreement, the reasonable attorney's fees and legal expenses incurred by the secured party;

(b) the satisfaction of indebtedness secured by the security interest under which the disposition is made;

(c) the *satisfaction of indebtedness secured by any subordinate security interest* in the collateral if written notification or demand therefor is received before distribution of the proceeds is completed. If requested by the secured party, the holder of a subordinate security interest must seasonably furnish reasonable proof of his interest, and unless he does so, the secured party need not comply with his demand.

(Emphasis supplied.)

It is clear from the stipulated facts at trial that NSB filed its financing statement a full 4 months prior to the McGowens' filing. Pursuant to § 9-312(5), NSB's security interest in the cattle is paramount and superior to that of the McGowens. The trial court made such a finding, albeit implicit, when it instructed the jury that "as a matter of law . . . the defendant had a prior or first security interest in the cattle."

Given NSB's superior lien position, § 9-504(1) entitles NSB to credit the amounts realized from the sale to the satisfaction of High's indebtedness to NSB. The "satisfaction of [any] indebtedness secured by any subordinate security interest" is last in priority for distribution of the sale proceeds. If those proceeds are insufficient to satisfy the senior secured party's lien, the junior lienholder takes nothing.

We hold that the "loss" envisioned by § 9-507(1), as to junior lienholders, refers to the loss of any surplus proceeds due to an improper disposition of the collateral. Surplus proceeds in this case means the difference between the fair market value of the

collateral, if sold at a proper sale, and the amount required to satisfy the senior lien. Thus, a junior lienholder can only be said to suffer a loss due to lack of notice if a commercially reasonable sale would have produced an amount in excess of the senior lien.

Our position finds support in the minimal case law and commentary existing on conflicts arising under § 9-507(1) between junior and senior lienholders. In *Food City, Inc. v. Fleming Companies, Inc.*, 590 S.W.2d 754 (Tex. Civ. App. 1979), and *Young v. Golden State Bank*, 41 Colo. App. 480, 589 P.2d 1381 (1978), the courts held that the junior lienholders had suffered no loss if the fair market value of the collateral sold was less than the amount of the senior liens.

We note that one authoritative commentator has also suggested the same result which we reach in this opinion. Nickles, *Rights and Remedies Between U.C.C. Article 9 Secured Parties With Conflicting Security Interests in Goods*, 68 Iowa L. Rev. 217 (1983). As noted by Nickles, calculation of damages under the "any loss" provision of § 9-507(1) is not explained by the section itself or by any other section within article 9. Given that the code does not specify any measure of damages in these cases, it is appropriate to look to precode cases for guidance.

Nickles points out that

> [u]nder pre-Code law, if a senior secured creditor improperly disposed of collateral, his conduct was characterized as a *conversion*. Of course, the junior creditor could not recover the full value of the collateral, but could recover only the value of his interest therein. This value was calculated by determining the market value of the property as of the time of the conversion and subtracting therefrom the amount of the senior creditor's encumbrance. A senior secured party's liability to a subordinate secured party under section 9-507(1) for failing to comply with the provisions of Part 5 also should be calculated in this manner, whether or not the misconduct is technically characterized as a conversion. When a proper sale is conducted, the junior secured party can expect to receive only the surplus proceeds that remain

after the senior creditor has satisfied the expenses of foreclosure and his own superior security interest. . . . If the senior creditor's sale of the collateral is improperly conducted, *the junior secured party's actual loss is the amount that would have remained after subtracting the legitimate expenses of foreclosure and the senior creditor's security interest from the amount that would have been produced by a proper sale*—the fair market value of the collateral. Measuring the junior secured party's "any loss" under section 9-507 in this way is essentially identical to the method used in pre-Code cases of this sort, and, more important, it will put the subordinate creditor "in as good a position as if the other party [the senior secured party] had fully performed," which is the express purpose of the Code remedies.

(Emphasis supplied.) Nickles, *supra* at 235-36.

The precode measure of damages result set forth in the Nickles article is identical to the precode result reached by Nebraska courts. Disputes between chattel mortgagees were settled according to this principle: "The rule is well settled in this state that if the actual value of the property is applied upon the mortgage, and is insufficient to pay the same the mortgagee cannot be held liable to the mortgagor or subsequent mortgagees in an action for conversion of the property." *Dempster Mill Mfg. Co. v. Wright*, 1 Neb. (Unoff.) 666, 668, 95 N.W. 806, 807 (1901).

Our interpretation of the "any loss" provision of § 9-507(1), based on a necessary reference to §§ 9-312(5) and 9-504(1), is not only consistent with this state's precode case law, but also effectuates the code's desire that the "aggrieved party may be put in as good a position as if the other party had fully performed . . . ." Neb. U.C.C. § 1-106 (Reissue 1980).

In the case at bar McGowens offered testimony alleging that the cattle were worth nearly $50,000, instead of the $28,956 which NSB sold them for at auction. Even if we accept McGowens' value estimate as true, this would not entitle the plaintiffs to any recovery. The evidence indicated that High was indebted to NSB for over $372,000. Applying these facts to our holding regarding the "any loss" provision of § 9-507(1), we

conclude that in the absence of evidence that these cattle were worth over $372,000, i.e., the amount sufficient to satisfy the senior lien, McGowens have suffered no loss.

This case also included a cross-appeal in which the McGowens, as cross-appellants, challenged an order of the district court recalling a writ of execution on the judgment in this case. Although we find no authority for the district court's action, any further disposition of this issue is unnecessary, given our decision on the main issue in this case.

The jury verdict in this case in favor of plaintiffs-appellees must be set aside because, as a matter of law, there was no evidence to support a finding of damages. We reverse, and remand the cause to the district court with directions to enter an order accordingly.

REVERSED AND REMANDED WITH DIRECTIONS.