RIVER VALLEY STATE BANK, Plaintiff-
Respondent,

v.

H.O. PETERSON, Defendant-Appellant,

THERMAL DYNAMICS, INC., Defendant.

Court of Appeals

*No. 89-1219. Submitted on briefs December 7, 1989.—Decided
January 17, 1990.*

(Also reported in 453 N.W.2d 193.)

For defendant-appellant there were briefs submitted by *Richard J. Kelly* and *Jane E. Lokken* of *Garvey, Anderson, Kelly & Ryberg, S.C.,* of Eau Claire.

For plaintiff-respondent there was a brief submitted by *Philip J. Freeburg* of *Krueger, Tlusty, Hittner & Kennedy, S.C.,* of Schofield.

Before Cane, P.J., LaRocque and Myse, JJ.

CANE, P.J.   This case involves a dispute between H.O. Peterson, holder of a landlord's lien over his tenant, Thermal Dynamics, Inc.'s, property, and the River Valley State Bank, which had a security interest on the same property. Peterson, by virtue of his landlord's lien, took possession of the tenant's property and sold some of the items without giving proper notice to the bank. After a nonjury trial, the court awarded damages to the bank against Peterson for its lost opportunity to purchase some of the collateral and sell it at a higher price. The narrow issue on appeal relates to the measure of damages in cases involving the "any loss" provision of sec. 409.507(1), Stats. Because the bank did not suffer a loss,

the judgment is reversed and the matter is remanded to the circuit court with directions to dismiss the bank's action.

The basic facts are undisputed. Thermal Dynamics, Inc., a now defunct corporation, assigned the bank a security interest in personal property that it subsequently abandoned on the premises it leased from Peterson. The abandoned property included several vats containing toxic chemicals. As a result of this abandonment, Peterson incurred costs in excess of $30,000 for storage and removal of these toxic chemicals.[1]

██ The trial court correctly held that under sec. 704.05(5)(c), Stats., Peterson's landlord's lien on the property had priority over the bank's secured interest.[2]

---

[1]Section 704.05(5)(b), Stats., provides:

*Storage of personalty $100 or more in value.* If a tenant removes from the premises and leaves personal property of an apparent total value of $100 or more, the landlord may store such personal property, with or without notice to the tenant, on or off the premises; in such case the landlord has a lien on the property for the actual cost of removal and storage or, if stored by the landlord, for the reasonable value of such storage. This lien can be foreclosed by sale of the property substantially in conformity with s. 409.504, and the landlord shall have the rights and duties of a secured party thereunder. When s. 409.504 is applied to the enforcement of this lien, the word debtor or equivalent, when used therein, shall be deemed to refer to the tenant and any other person having an interest shown by instrument filed as required by law in the records of the department of transportation, and the word "indebtedness" or equivalent shall include all claims of the landlord for removal, storage, disposition, arranging for the sale and reasonable attorney's fees and legal expenses.

[2]Section 704.05(5)(c), Stats., provides in part:

*Rights of third parties.* The landlord's lien and power to dispose as provided by this subsection apply to any property left on the premises by the tenant, whether owned by him or by others. Such lien has priority over any ownership or security interest and the

Peterson, however, is required by sec. 409.504, Stats., to give notice to the bank of any intended disposition of the property. Additionally, the bank sent Peterson a letter requesting notification before he disposed of any of the property. The bank never waived its right to notice. In the event the required notice is not given, sec. 409.507(1) provides:

> If the disposition has occurred the debtor or any person entitled to notification or whose security interest has been made known to the secured party prior to the disposition has a right to recover from the secured party *any loss* caused by a failure to comply with ss. 409.501 to 409.507. (Emphasis supplied.)

Before disposing of the property, Peterson often gave the bank oral notice. But when he disposed of a large bake oven in a package deal for $6,400, he failed to give the bank any notice. The bank submitted evidence that several months before this sale it had received an offer from a third party to purchase the oven for $10,000. Peterson received a total of $10,050 for all of the secured property.

At trial and on appeal, the bank argues that it suffered a "loss" by Peterson's failure to give it notice of the sale, because it was deprived of the $3,600 profit it could have realized by buying the oven at the sale and subsequently reselling it at the higher price. It reasons that when the primary lienholder violates this provision of the Uniform Commercial Code (U.C.C.), the parties are denied their expectations, and the difference between the fair market value and the sale price is the appropriate measure of damages. Peterson argues that the term

---

power to dispose under this subsection applies notwithstanding rights of others existing under any claim of ownership or security interest.

"any loss" refers to the loss of any proceeds that would have exceeded the amount of his landlord lien and therefore would have been available to satisfy the bank's interest.

Although Wisconsin has not addressed this issue, other jurisdictions have discussed this part of the U.C.C. In *McGowen v. Nebraska State Bank*, 427 N.W.2d 772 (Neb. 1988), the Nebraska Supreme Court faced an almost identical situation. In *McGowen*, a senior lienholder repossessed livestock and sold the debtor's livestock at an auction without notice to the junior lienholders. As in this case, the junior lienholders argued that they were damaged by the failure to give notice because they were deprived of the profit they could have realized by buying the livestock at the sale and subsequently reselling them at a higher price. They also reasoned that the measure of damages should be the difference between the fair market value of the livestock and the sale price. The court in *McGowen* rejected the argument and concluded that the "loss" envisioned in sec. 9-507(1) of the U.C.C. (our sec. 409.507(1), Stats.), as to junior lienholders,

> refers to the loss of any surplus proceeds due to an improper disposition of the collateral. Surplus proceeds in this case means the difference between the fair market value of the collateral, if sold at a proper sale, and the amount required to satisfy the senior lien. Thus, a junior lienholder can only be said to suffer a loss due to a lack of notice if a commercially reasonable sale would have produced an amount in excess of the senior lien.

*McGowen*, 427 N.W.2d at 775.

Although *McGowen* is not binding on this court, we agree with Nebraska's analysis. The bank does not dispute that Peterson's landlord's lien takes priority over its security interest. Thus, for the purposes of our discussion, Peterson is the senior lienholder and the bank is the junior lienholder. Section 409.504(1), Stats., determines the order of distribution of proceeds from collateral sales under article 9 of the U.C.C. The order is:

> (a) The reasonable expenses of retaking, holding, preparing for sale or lease, selling, leasing and the like and, to the extent provided for in the agreement and not prohibited by law, the reasonable attorneys' fees and legal expenses incurred by the secured party;
> (b) The satisfaction of indebtedness secured by the security interest under which the disposition is made;
> (c) The satisfaction of indebtedness secured by any subordinate security interest in the collateral if written notification of demand therefor is received before distribution of the proceeds is completed. If requested by the secured party, the holder of a subordinate security interest must seasonably furnish reasonable proof of his interest, and unless he does so, the secured party need not comply with his demand.

The junior lienholder's interest is satisfied last, and this lienholder takes nothing if the proceeds do not cover the senior lienholder's expenses and security interest.

Given Peterson's superior lien position, sec. 409.504(1) entitles Peterson to credit the amounts realized from the sale to the tenant's indebtedness. The bank's subordinate interest in the distribution of the sale proceeds comes into play only after Peterson's interest has been satisfied. Thus, if the sale proceeds are insuffi-

cient to satisfy Peterson's interest, the bank takes nothing. Consequently, the bank can only be said to suffer a loss due to the lack of notice if a commercially reasonable sale would have produced an amount in excess of Peterson's lien.

As pointed out in *McGowen,* this position finds support in the limited case law and commentary existing on conflicts arising under sec. 409.507(1) between junior and senior lienholders. In *Food City, Inc. v. Fleming Companies,* 590 S.W.2d 754 (Tex. Civ. App. 1979), and *Young v. Golden State Bank,* 589 P.2d 1381 (Colo. 1978), "the courts held that the junior lienholders had suffered no loss if the fair market value of the collateral sold was less than the amount of the senior liens." *McGowen,* 427 N.W.2d at 775–76.

One authoritative commentator has also suggested the same result: Nickles, *Rights and Remedies Between U.C.C. Article 9 Secured Parties With Conflicting Security Interests in Goods,* 68 Iowa L. Rev. 217 (1983). The calculation of damages under the "any loss" provision of sec. 409.507(1), Stats., is not explained by the section itself or by any other section within the U.C.C. Given that the Code does not specify any measure of damages in these cases, it is appropriate to look to pre-U.C.C. cases for guidance.

Nickles points out that:

> "[u]nder pre-Code law, if a senior secured creditor improperly disposed of collateral, his conduct was characterized as a *conversion.* Of course, the junior creditor could not recover the full value of the collateral, but could recover only the value of his interest therein. This value was calculated by determining the market value of the property as of the time of the conversion and subtracting therefrom the amount of the senior creditor's encumbrance. A senior secured

448

party's liability to a subordinate secured party under section 9-507(1) for failing to comply with the provisions of Part 5 also should be calculated in this manner, whether or not the misconduct is technically characterized as a conversion. When a proper sale is conducted, the junior secured party can expect to receive only the surplus proceeds that remain after the senior creditor has satisfied the expenses of foreclosure and his own superior security interest . . .. If the senior creditor's sale of the collateral is improperly conducted, *the junior secured party's actual loss is the amount that would have remained after subtracting the legitimate expenses of foreclosure and the senior creditor's security interest from the amount that would have been produced by a proper sale*—the fair market value of the collateral. Measuring the junior secured party's 'any loss' under section 9-507 in this way is essentially identical to the method used in pre-Code cases of this sort, and, more important, it will put the subordinate creditor 'in as good a position as if the other party [the senior secured party] had fully performed,' which is the express purpose of the Code remedies."

Nickles, *supra,* at 235-36, *quoted in McGowen,* 427 N.W.2d at 776 (emphasis supplied).

As noted by Nickles, this interpretation of the "any loss" provision also effectuates the U.C.C.'s desire that the "aggrieved party may be put in as good a position as if the other party had fully performed . . .." Section 401.106(1), Stats. In addition, this interpretation is consistent with that of other jurisdictions, and thus serves one of the underlying purposes and policies of the Code—to make uniform the law among the various jurisdictions. *See* sec. 401.102(2)(c), Stats. We therefore conclude, as did Nebraska, that the "any loss" provision of

sec. 409.507(1), as to junior lienholders, refers to the loss of any surplus proceeds due to improper disposition of the secured collateral. Surplus proceeds means the difference between the fair market value of the collateral, if sold at a proper and noticed sale, and the amount required to satisfy the senior lien.

Accordingly, even if we accept the bank's evidence, the fair market value of the oven was $10,000.[3] If $10,000 had been received for the oven, this would have increased the amount recovered from collateral sales another $3,600 ($10,000 − $6,400) for a total sum of $13,650 ($10,050 + $3,600), far less than Peterson's interest of at least $30,000. Because there would be no surplus proceeds, the bank has not suffered any loss. The court's judgment in favor of the bank must therefore be set aside because, as a matter of law, there was no evidence to support a finding of damages. Therefore, we reverse and remand the action to the circuit court with directions to enter judgment accordingly.

*By the Court.*—Judgment reversed and cause remanded with directions.

---

[3]Since the oven was sold as part of a package deal, obviously the other property in the deal had some value, but far too little to change the result.