Alfred D. PRUSKE, and Alfred D. Pruske, R. V., Inc., Appellants,

v.

NATIONAL BANK OF COMMERCE OF SAN ANTONIO, Appellee.

No. 15440.

Court of Civil Appeals of Texas, San Antonio.

Feb. 11, 1976.

Rehearing Denied March 17, 1976.

Robert L. Vale, Southers, Goldberg, Lyons & Huson, Inc., San Antonio, for appellants.

Ted D. Lee, Cox, Smith, Smith, Hale & Guenther, San Antonio, for appellee.

KLINGEMAN, Justice.

This is a suit by the National Bank of Commerce of San Antonio against Alfred D. Pruske, Patricia Pruske Harden, and Alfred D. Pruske, R. V., Inc., jointly and severally, under a floor plan agreement for motor homes, secured by installment loan security agreement, trust receipts, various promissory notes, and backed by personal guarantees of Alfred D. Pruske, to recover the unpaid balance remaining due after the sale of the mobile homes. Trial was to the court, which decreed: (a) plaintiff recover from all defendants, jointly and severally, the amount of $17,519.54, interest, attorney's fees, and consequential damages, with defendant, Patricia Pruske Harden, being granted indemnity and judgment over and against co-defendant, Alfred D. Pruske, for any sums paid by Patricia Pruske Harden on such judgment; (b) plaintiff recover from defendant, Alfred D. Pruske and Alfred D. Pruske, R. V., Inc., the further sum of $6,169.98, interest, and attorney's fees. Patricia Pruske Harden has not perfected an appeal from such judgment.

By three points of error appellant complains: (a) appellee has exercised an election of remedies by looking to other parties to satisfy its claim, even to the extent of securing final judgments against such other parties, thereby releasing appellant from his obligations; (b) the sale or disposition of the collateral was not conducted in a commercially reasonable manner, and therefore, appellee is not entitled to any recovery; (c) the court erred in granting judgment on behalf of appellee against appellant for that portion of the judgment represented by appellee's exhibits, "Q" and "R" (the Kroeger unit), in the amount of $12,388.73, for the reason that appellee did not make demand on appellant for the payment of the overdue installments before exercising its option of acceleration.

On January 24, 1972, appellant executed a floor plan agreement, security agreement, and a personal guarantee for the floor plan financing of motor homes by appellee. Pursuant to said agreements, appellee advanced credit to appellant for various motor homes, and in connection therewith, appel-

lant executed numerous trust receipts and promissory notes, which are shown in the record as exhibits. After appellant incorporated his business as Alfred D. Pruske, R. V., Inc., additional personal guarantees were executed by Alfred D. Pruske on January 11, 1973, guaranteeing the payment of all debts of the business. Subsequently, appellant obtained a divorce from his wife, Patricia, but continued to operate the business. During the year 1973, appellant began falling behind in the payments; and after several demands for payment were made, appellant finally obtained possession of the various motor homes. In 1973, appellant also advanced credit to appellant for a used Kroeger motor home under an installment loan security agreement, and a promissory note. Appellant also became delinquent in the payments of this loan, and appellee thereafter obtained possession of this motor home.

At the time that appellee entered into the floor plan agreement appellee also required repurchase agreements to be executed by each of the manufacturers of the new motor homes before it would finance such motor homes. After repossession of the new motor homes demand was made on each manufacturer for repurchase of these motor homes, with some manufacturers honoring their repurchase agreements, with the amounts received from such manufacturers being applied to reduce the debt of appellant. In addition, judgments were taken against two manufacturers, Ute Liner and Sooner. No payments on those judgments have been made by such manufacturers.

Appellee sold some of the new motor homes at private sales with appellant given an opportunity to submit an equal or higher bid; which he did not do. Thereafter, after notifying appellant of its intention, appellee advertised the remaining new mobile homes and the used Kroeger motor home for sale by ads run in both of the leading newspapers in San Antonio for three days, with the motor homes being made available for inspection by any prospective purchaser from 12 a. m. to 3 p. m. for five consecutive days at Playland Park on Broadway. Appellant was given an opportunity to submit bids, but did not. After receiving bids, appellee accepted the highest overall bid. After liquidating all mobile homes by the above described method and applying all amounts received to the debt of appellant, appellee made demand on appellant for payment of the remaining unpaid balance, and thereafter brought suit in March of 1974.

■ We first consider appellant's point of error that appellee has released appellant from his obligations by exercising an election of remedies and securing final judgments against two of the manufacturers. Appellant cites and relies on the provisions of Section 9.501(a) of the Business and Commerce Code, which reads as follows:

(a) When a debtor is in default under a security agreement, a secured party has the rights and remedies provided in this subchapter and except as limited by Subsection (c) those provided in the security agreement. He may reduce his claim to judgment, foreclose or otherwise enforce the security interest by any available judicial procedure. If the collateral is documents the secured party in possession has the rights, remedies and duties provided in Section 9.207. The rights and remedies referred to in this subsection are cumulative.

Appellant concedes in his brief that the remedies provided a secured party in said article are cumulative, and that the doctrine of election of remedies is not applicable in situations where the secured party is seeking to satisfy his claim for any deficiency due to a default and subsequent sale of the collateral (see page 5 of appellant's brief). However, it is apparently his contention that while a secured creditor may first attempt to enforce his rights by one method, and if that proves unsuccessful, to pursue another, he should not be permitted to harass a debtor by simultaneously pursu-

ing two or more of the several remedies available to him; that this constitutes a double-barrel attack, which is not proper; that in the instant case appellee somehow lost his rights against appellant by obtaining judgments against two of the manufacturers, Ute Liner and Sooner. It is also apparently appellant's contention that a satisfaction occurred in this case by the obtaining of these judgments, even though it is undisputed under the record that no payments have ever been received under such judgments.

We find no authority to support appellant's contention. The rule is set forth in 51 Tex.Jur.2d, § 288, at 557, as follows:

The remedies given the secured party upon default, including obtaining a judgment, foreclosing, or otherwise enforcing the security interest by available legal procedure, taking possession of the collateral, making direct collection from any account debtor or obligor on an instrument, disposing of the collateral, purchasing the collateral, or proposing to take the collateral in satisfaction of the obligation are expressly made cumulative under the Code. There is no necessity for the secured party to elect between remedies; he may take any permitted action or combination of actions.

See also Loiseaux, *Default Proceedings Under the Texas Uniform Commercial Code*, 44 Texas L.Rev. 702, 711 (1966), wherein it is stated:

Then in section 9–501(1) it is provided that after default the secured party has the rights and remedies given in part 5 of article 9, and those given in the security agreement; it provides also that the secured party may reduce his claim to judgment, foreclose, or otherwise enforce the security interest by any available judicial procedure. The concluding sentence of the subsection then proceeds to state: 'The rights and remedies referred to in this subsection are cumulative.' It would seem that the purpose of the Code is

quite clear, namely, to abolish the doctrine of election of remedies when a security interest is enforced. The secured party is entitled to only one satisfaction, but he may seek it in a number of ways, even though they may presently be considered inconsistent.

We are unable to see how appellee's action in pursuing one of his cumulative rights and remedies against the manufacturers on their repurchase agreement, collecting on some and crediting such payments on appellant's debt, and in two instances obtaining judgments against certain manufacturers, is a harassment of the debtor, or amounts to a double-barrel attack upon the debtor. In actuality it is an aid and benefit to the debtor as the effect is to reduce his debt, and is specifically authorized by the Code.

Appellant's argument that the obtaining of a judgment against another party is a satisfaction of the debt is also without merit where such judgment has not been collected nor has any payment been made on it. The cases cited by appellant do not support such contention. See *Armour Bros. Banking Co. v. Addington*, 1 Ind.T. 304, 37 S.W. 100, 102 (1896), wherein it is said:

But a second judgment obtained upon the first is of no higher security than the first. Both should stand until the debt which is evidenced by them is fully paid off and satisfied. The first judgment is neither satisfied, merged, nor extinguished by a second judgment on the same cause of action, or by an affirmance thereof by a superior court. 'Satisfaction' is a technical term, and in its application to a judgment it means the payment of the money due on the judgment, which must be entered of record, and nothing but this is a legal satisfaction of the judgment.

Appellant's first point of error is without merit, and it is overruled.

Appellant's second point of error is that appellee is not entitled to any recovery be-

cause the sale or disposition of the collateral was not conducted in a commercially reasonable manner.

Tex.Bus. and Commerce Code, Section 9.504(c) provides in part as follows:

Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor

. . . .

Section 9.507(b) of such Code provides in part as follows:

The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. If the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner.

■ The burden of proving commercial unreasonableness is on the debtor. *Tarrant Savings Association v. Lucky Homes, Inc.,* 390 S.W.2d 473 (Tex.1965); *Fryer & Willis Drilling Co. v. Oilwell, Division of U. S. Steel,* 472 S.W.2d 857 (Tex.Civ.App.—Waco 1971), *rev'd on other grounds,* 493 S.W.2d 487 (Tex.1973).

In support of his contention that the sale was not conducted in a commercially reasonable manner, appellant relies chiefly on the testimony of William R. Harden, the husband of Patricia Harden, and John Jones, an auctioneer.

The thrust of Mr. Harden's testimony is that, in his opinion, the sale was not commercially reasonable. Harden worked for Alfred D. Pruske from August to December 1972, at which time Patricia Pruske Harden was the wife of Alfred D. Pruske, but she was divorced sometime thereafter and married the witness, William R. Harden; and at the time of the institution of suit and at the time of the trial against Alfred D. Pruske and herself, she was married to Mr. Harden.

Harden stated that he has been in the recreational vehicle business since February 1969. He testified in some detail as to what he regarded a commercially reasonable sale to be, and how the herein sale differed in various respects from what he regarded as commercially reasonable: (a) there was not sufficient advertising, or sufficient opportunity for prospective purchasers to inspect and bid on the motor homes; (b) that if he was conducting the sale, he would contact the various dealers, go through the files of the company for previous prospects, and would make direct contact with such persons; (c) that he would advertise in the financial and sports section of the paper; (d) that he would have requested 90 days for the sale, and would have the sale at least six days a week, from 9 a. m. to 6 p. m., and that the best place for a sale would be the lot where the customers could see the service department.

He further testified what he considered to be a fair and reasonable price of various motor homes, and stated that, in his opinion, many motor homes sold did not bring what they were worth, and that some were sold at substantially lower prices.

John Jones testified that he was in the auction business, and that the firm he is

associated with auctions off distressed merchandise; that he has not auctioned off motor vehicles, but that the firm has, and that around five years ago such firm conducted a motor home liquidation.

He stated that if he was conducting a sale rather than an auction, he would need a week to do research on the particular item, then he would submit a proposal to his client asking for state-wide advertising; that he would try to saturate the market; that in his opinion, the best place to hold a sale would be on the lot where the motor homes had been previously located; that if he were conducting the sale on a basis other than an auction, he would need at least 30 days, but that he believed that an auction was the best method.

He testified that he believed that either he or his firm was contacted with regard to the liquidation of the units previously belonging to Alfred D. Pruske, R. V., Inc.; that his partner proposed to sell the units at public auction for a 10% commission, plus 5% for advertising, with $5,000 to $6,000 being quoted for advertising. He stated that the advertising was at the expense of the consignor, which would have to be paid irrespective whether any sales were made or not, but that the 10% sale commission was paid only after a sale was made.

Appellee relies greatly on testimony that at the time of the repossession and the sales, the motor home business was in a very depressed state because of the gasoline shortage, and that under the market conditions the sales which were conducted by it brought an excellent return considering the state of the market. A disinterested witness, Mr. Donald E. McKelvey, testified that he had been in the mobile home business for 23 years, and that the company he owns is one of the largest companies in San Antonio, dealing with the type of recreational vehicle in which Pruske was a dealer. He testified that in 1973 and January of 1974, the market was in a critical state. He stated he had heard about Pruske's problems, and in October, November, and December of 1973, he would not have been remotely interested in purchasing; that in February of 1974 he would have looked at it if the price was right. He stated that he knew of companies that were being purchased at fifty to sixty cents on the dollar, and he would have been interested at that price. He further testified that Pruske never seriously approached him about buying the units. He stated that the serious conditions in the motor homes market were brought about by the gasoline situation beginning in the early part of 1973; and that when the embargo hit in about September or October, the market virtually stopped; that nationwide at least 150 to 200 manufacturers went bankrupt; that the market was somewhat on an upgrade in January, February and March.

Mr. Shirley, an Assistant Vice-President of the national Bank of Commerce, testified in some detail about the handling of the liquidation of the motor units. He stated various units were sold at private sale on different dates, and that it was finally decided to sell the remaining units at public sale, and to advertise it.

Mr. Jeffrey Wentworth, an attorney who once represented Mr. Pruske, testified chiefly in regard to the notices and letters received by Pruske. He testified that he and Mr. Pruske had conferred with appellee's attorney about the situation, and that they had agreed to voluntarily relinquish possession of the motor homes.

Ted Lee, an attorney for appellee, also testified in some detail as to the various financial transactions, and as to the various notices and demands sent to Pruske.

It appears from the various exhibits and other evidence in the record that the amount owing on the repossessed new motor homes and the used Kroeger unit was over $100,000.00; and that the sale of such units by private and public sale brought in approximately $84,000.00, in excess of 75%

of the total indebtedness. Moreover, it appears from the record that the expenses of such sale, including insurance, were only $1,362.10.

Appellee asserts that in view of the extremely depressed market and the testimony that motor homes were being sold at fifty to sixty cents on the dollar, that a recovery of well over 75% was extremely good; that the expenses of such sale were very low; and that the expenses from an auction sale, including advertising and commissions, would have been a great deal higher, with no guarantee that any greater amount would have been received from such a sale under the conditions of the market.

Appellee contends that the trial court's implied finding that the sales were conducted in a commercially reasonable manner is supported by the following evidence: (a) the market for motor homes was in a very depressed state because of the energy crisis, and a large number of manufacturers were going broke; (b) before each and every motor home was sold appellant was notified and given a reasonable opportunity to submit a higher bid; (c) the sales price of the homes sold at private sale covered the entire unpaid principal owed on these motor homes; (d) adequate advertising of the remaining motor homes was made in three leading San Antonio newspapers with written bids being sent to appellee; (e) adequate opportunity for inspection was given to prospective purchasers; (f) after receiving all the written bids, appellee accepted the highest overall bid for the remaining units, thereby reducing the total indebtedness by the maximum amount; (g) the expenses of such sale were minimal, thereby increasing the net amount credited on appellant's indebtedness.

Mere inadequacy of consideration alone does not render a foreclosure void if the sale was legally and fairly made. *Tarrant Savings Association v. Lucky Homes, Inc., supra; Fryer & Willis Drilling Co. v. Oilwell, Division of U. S. Steel, supra.* The fact that a better price could have been obtained by selling at a different time and a different method from that selected by the secured party, is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. Tex.Bus. and Commerce Code, § 9.507(b).

The courts, in determining whether a sale was commercially unreasonable, have considered many factors. See Siegel, *The Commercially Reasonable Disposition of Collateral,* 80 Comm.L.J. 67 (1975).[1]

The question of what constitutes commercial reasonableness is sometimes a difficult one. A distinguished commentator has noted that Section 9.504 "attempts to chart a path in the narrow area between two policy positions; one, a desire to impede dishonest dispositions, and the other a reluctance to strangle honest transactions with red tape." Hogan, *The Secured Party In Default Proceedings Under The UCC,* 47 Minn.L.Rev. 219–20 (1962).

A secured party is often placed on the horns of a dilemma. If he does sell, the debtor may complain that he should have waited for a higher offer. If he does not sell because he thinks the price might be deemed inadequate, the creditor may ultimately be obligated to sell at a lower price, in which case the debtor will possibly claim the secured party's failure to go forward with the initial sale violated commercial reasonableness.

Questions involving the propriety of the sale are fact issues for the trial court.

1. Some of these factors are: (1) the secured party's obligation to obtain the best price possible; (2) whether it would be advantageous to sell the collateral in separate units or in bulk; (3) whether it would be best to sell at public sale or at private sale; (4) whether the collateral is available to prospective purchasers for inspection before and at the sale; (5) when the collateral should be sold; (6) the avoidance of unnecessary expenses; (7) whether the property was purchased by the secured party or by an outside party.

*Tarrant Savings Association v. Lucky Homes, Inc., supra.* In the case before us, no findings of fact or conclusions of law were requested of or made by the trial court. Where no findings of fact or conclusions of law have been requested of or made by the trial court, an appellate court must presume that the trial court found all necessary facts in favor of the judgment and a reviewing court is bound by such findings if there is any evidence of probative value to support same. *Frost v. Village of Hilshire Village,* 403 S.W.2d 836 (Tex.Civ.App.— Houston 1966, writ ref'd n. r. e.); *Texas State Board of Medical Examiners v. Haynes,* 388 S.W.2d 258 (Tex.Civ.App.— Tyler 1965, no writ); *Johnson v. Back,* 378 S.W.2d 723 (Tex.Civ.App.—Amarillo 1964, no writ); *Nortex Oil & Gas Corp. v. Clark,* 369 S.W.2d 671 (Tex.Civ.App.—Dallas 1963, no writ); *U. S. Truck Lines v. Texaco, Inc.,* 337 S.W.2d 497 (Tex.Civ.App.—Eastland 1960, writ ref'd).

■ The trial court impliedly found that the sale was commercially reasonable. We have carefully examined all of the evidence, and under the record there is sufficient evidence of probative value to support such finding.

Appellant's second point of error is overruled.

■ By his last point of error appellant complains that the trial court erred in granting judgment for appellee against appellant for that portion of the judgment represented by the Kroeger unit (appellee's exhibits "Q" and "R") for the reason that appellee did not make a demand on appellant for the payment of the overdue installment before exercising its option of acceleration.

The note in question contains this provision:

Each of the undersigned and all guarantors, endorsers and sureties of this Note expressly waive presentment for payment, demand, protest, notice thereof and dishonor and diligence in collecting. . . .

Before discussing the effect of the above waiver provision, we will consider appellee's contention that there is ample evidence in the record that demand for payment was made, irrespective of any waiver. Appellee's attorney so testified, and there were introduced into evidence as exhibits two letters wherein it was pointed out that appellant was behind in his payments on such note, and that if the payments were not made, the units in default would be repossessed, and any necessary legal action taken. There is also testimony that appellant's then attorney had discussed the Kroeger unit with appellee's attorney on or about January 19, 1974, and such attorney told appellee's attorney that appellant could not continue to make the payments and for the bank to pick up the unit.

Appellant, Alfred D. Pruske, testified only by deposition. In the portions of such deposition introduced into evidence there is no testimony whatsoever concerning the question of demand for payment, and nowhere therein does he ever deny that such demand was made, or ever state that no demand was made. There is testimony that Mrs. Patricia Harden was not contacted in regard to the defaults on the note, but Mrs. Harden has not perfected an appeal, and is not a party to this appeal.

Moreover, appellee asserts that in view of the waiver provision in the note hereinabove set forth, no such demand was necessary. This question was considered by this court in *Whalen v. Etheridge,* 428 S.W.2d 824 (Tex.Civ.App.—San Antonio 1968, writ ref'd n. r. e.), where the note contained a very similar provision.[2] In upholding such waiver provision and overruling appellant's

---

2. Each maker, surety, and endorser waives demand, grace, notice, presentment for payment and protest, and agrees and consents that this note and the liens securing payment may be renewed, and the time of payment extended without notice, and without releasing any of the parties.

contention in such regard, this court cited numerous cases, particularly *Inter-State Life Insurance Co. v. Turner*, 371 S.W.2d 913 (Tex.Civ.App.—Waco 1963, writ ref'd n. r. e.), where the court said:

> In our opinion demand and presentment were not necessary. The note expressly provided that notice of intention to accelerate maturity, demand and presentment for payment were waived. Art. 5937, Sec. 82, Vernon's Ann.Tex.Stats. provides that presentment for payment is dispensed with by express waiver. This waiver is valid and effective.

There is ample evidence in the record to support the trial court's implied finding that demand for payment was made, in addition to the fact that the note involved contained an express waiver provision. Appellant's point of error number three is overruled.

All of the appellant's points of error have been considered, and all are overruled. The judgment of the trial court is affirmed.