BANK ONE, TEXAS, NATIONAL ASSOCIATION, Plaintiff,

v.

Paul J. MONTLE, Defendant,

and

Baybank, Boston Company Inc. Money Fund, Fidelity Investments, Prudential Bache, Boston Trade Bank, and Montle International, Inc., Trustee Defendants.

Civ. A. No. 90–11857–MA.

United States District Court, D. Massachusetts.

May 6, 1991.

---

Lisa A. Pake, Peabody & Arnold, Boston, Mass., for plaintiff Bank One, Texas, Nat. Ass'n, and trustee defendants Boston Trade Bank, Boston Safe Deposit and Trust Co., Boston Co. Inc., Fidelity Investments and Prudential Bache Securities, Inc.

Robert P. Hilson, Hingham, Mass., for Paul J. Montle, defendant.

## MEMORANDUM AND ORDER

MAZZONE, District Judge.

Plaintiff, Bank One, Texas, N.A. ("the Bank"), filed this diversity suit to recover the deficiency due under a note executed by defendant, Paul Montle, in the Bank's favor and secured by shares of National Environmental Group (NEG) stock. Defendant has counterclaimed and alleged that the Bank's sale of the collateral was commercially unreasonable and that its actions in selling the stock caused defendant to lose an amount that would have represented the surplus from the sale. The Bank amended its complaint to add six trustee defendants believed to be holding assets of Paul Montle. The suit is before the court on plaintiff's motion for summary judgment in its favor both on the claims set forth in its amended complaint and on defendant's counterclaims.

I

As a preliminary matter, defendant contests this court's subject matter jurisdiction. Montle filed a motion to dismiss the suit against him, asserting that diversity of citizenship does not exist because both he and the plaintiff Bank are citizens of Texas. Both parties have submitted affidavits on the issue.

To determine whether diversity jurisdiction exists, it is settled law that "[d]omicile at the time the suit is filed is the test and jurisdiction once established is not lost by a subsequent change in citizenship." *Hawes v. Club Ecuestre el Comandante*, 598 F.2d 698, 701 (1st Cir.1979). The Bank asserts that when it filed suit on July 30, 1990, Montle was a domiciliary of Massachusetts and that, therefore, diversity jurisdiction attached. Montle asserts that he changed domicile before the suit was filed.

Generally, the plaintiff bears the burden of proof on the issue of diversity jurisdiction. *Thomson v. Gaskill*, 315 U.S. 442, 446, 62 S.Ct. 673, 675, 86 L.Ed. 951 (1942); *Hawes*, 598 F.2d at 702. The Bank argues, however, on the basis of the ancient presumption that "domicile once acquired is presumed to continue until it is shown to have been changed," *Mitchell v. United States*, 88 U.S. (21 Wall.) 350, 353, 22 L.Ed. 584 (1875), that Montle bears the burden of proving that he changed citizenship. This proposition finds support in the case law. *See, e.g., Kaiser v. Loomis*, 391 F.2d 1007, 1009–10 (6th Cir.1968); *Stine v. Moore*, 213 F.2d 446, 447–48 (5th Cir.1954).

In more recent formulations, however, the presumption of continuing domicile is seen as shifting to the party challenging jurisdiction only the *burden of production* on the issue of citizenship, while the *burden of proof* remains with the proponent of federal jurisdiction. *See, e.g., Lew v. Moss,* 797 F.2d 747, 751 (9th Cir.1986); *Slaughter v. Toye Bros. Yellow Cab Co.,* 359 F.2d 954, 955 (5th Cir.1966); *Avins v. Hannum,* 497 F.Supp. 930, 936 (E.D.Pa.1980).

This distinction between the burden of production and the burden of persuasion is also endorsed by the commentators: "Leaving the ultimate burden of persuasion on the party invoking federal jurisdiction seems consistent with the notion that federal courts are courts of limited jurisdiction." 13B C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3611 at 525 (2d ed.1984). On the basis of the authorities cited above, I hold that Montle bears the burden of coming forward with evidence of his changed citizenship, but that the ultimate burden of proving diversity of citizenship remains with the Bank.

 Montle has met his burden of production by filing with this court his affidavit, stating that he became a domiciliary of the state of Texas on June 26, 1990, the date he established residency there. Affidavit of Paul J. Montle in Support of Motion to Dismiss ¶ 2. He also states that he has lived and worked in Texas since May 21, 1990, and that he abandoned his Massachusetts residence in May, 1990. *Id.* ¶¶ 5–6. He attached to his affidavit his Texas voter registration certificate, dated July 25, 1990, and his application for a Texas driver's license, dated October 2, 1990.

To contest Mr. Montle's affidavit, the Bank has filed the affidavit of Devin L. Holum, a former commercial loan officer of the Bank, who corresponded with Montle in an effort to collect on the note. Holum attached to his affidavit a letter he had received from Montle dated July 19, 1990, which showed Montle's return address as "147 Main Street, Hingham, MA." While it falls short of establishing that Montle was a Massachusetts domiciliary on July 30, 1990, the letter does call into question the credibility of Mr. Montle's affidavit, in which he stated that he had abandoned his Massachusetts residency as of May, 1990, at least seven weeks prior to the date he sent the letter giving a Massachusetts return address.

The Bank also submitted the affidavit of a paralegal employed by its attorney; Montle objects to this affidavit as untimely, incompetent, and hearsay. In my view, it has little probative value as well, so I disregard it.

Following a conference on this and other issues, the Bank filed the affidavit of Richard J. Jope, the Supervisor of Mail and Delivery at the Hingham, Massachusetts, post office. Defendant would likely oppose this affidavit as untimely, but given the well established fact that "subject matter jurisdiction may be litigated at any time before the case is finally decided," *Eisler v. Stritzler,* 535 F.2d 148, 151 (1st Cir.1976), it follows that evidence on the issue can be received at any time as well. I therefore consider the Jope affidavit, which states that Paul Montle submitted a change of address form to the post office on August 9, 1990, indicating his former address as "175 Derby Street, Hingham," and requesting that his mail be forwarded to a Texas address as of August 14, 1990. The Derby Street address is the address of the law offices of Montle's attorney.

Although it is a close question, based on the evidence before me I find that the Bank has satisfied its burden of proving that diversity of citizenship existed on July 30, 1990, the day it filed suit. My primary reason for so finding is that the Bank's evidence calls the credibility of defendant's sworn testimony deeply into question. The evidence as a whole indicates that Montle's intent to reside permanently in Texas hardened only in retrospect, after plaintiff had attached substantial assets in Massachusetts, and was conveniently timed only to defeat this court's jurisdiction.

II

The merits of the Bank's summary judgment motion are much more easily re-

solved. Montle does not contest that he breached his obligations to the Bank under the note or that the Bank was entitled to foreclose on the stock to satisfy his indebtedness. Rather, Montle claims that the Bank foreclosed in a commercially unreasonable fashion and that, had the sale been conducted differently, rather than his owing the Bank for a deficiency, the Bank would owe him the excess proceeds from the sale of the stock. The only question for the court to decide is whether the Bank's actions were, as a matter of law, commercially reasonable.

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). "[T]he question is not whether there is literally no evidence favoring the nonmovant, but whether there is any upon which a jury could properly proceed to find a verdict in that party's favor." *De Artega v. Pall Ultrafine Filtration Corp.*, 862 F.2d 940, 941 (1st Cir.1988). "Unsupported allegations are insufficient to create a genuine dispute." *Ortega–Rosario v. Alvarado–Ortiz*, 917 F.2d 71, 73 (1st Cir.1990).

The Bank's affidavits—a second affidavit of Devin L. Holum and the affidavit of Otto S. Glaser—establish the following facts. On April 30, 1989, Paul Montle executed a renewal note, payable to the order of the Deposit Insurance Bridge Bank, Bank One's predecessor in interest, in the original principal amount of $376,000. The note was secured by 843,060 shares of stock in Yankee Oil & Gas, Inc., now NEG.

Montle defaulted on the note, and after notifying Montle of his default and warning him that it would accelerate the loan if payments were not soon received, the Bank accelerated the outstanding principal balance, which was $326,000, together with unpaid interest and the costs of its collections efforts, including attorney's fees. Montle failed to take any steps to remedy the deficiency, and in a letter dated February 23, 1990, the Bank advised him that "the Lender has elected to enforce its power of sale under the Security Agreement, any time after 15 days from the date of this letter." Affidavit of Devin L. Holum, Exh. D, at 2. The Bank ultimately foreclosed on its security interest and took title to the stock in early March, 1990. The bank retained A.G. Edwards & Sons, Inc., to act as its agent in selling the stock.

Otto Glaser, an investment broker with 28 years of experience, took charge of the sale. He first contacted NEG's president and CEO, Francis John, to see if NEG was aware of any prospective buyers. Mr. John was not, but he did tell Glaser that he hoped the shares could be sold before June 30, 1990, so as not to interfere with the planned restructuring· of the company. Glaser next asked A.G. Edwards's Institutional Handling Desk to contact institutional holders who might be prospective purchasers. This step also produced no buyers.

On March 16, 1990, A.G. Edwards offered 100,000 shares of the stock on the American Stock Exchange at 7/16 per share. Three thousand shares were sold at that price. Also on March 16, one Mr. Greenfield, having seen the stock offered on the American Stock Exchange, made an inquiry to Glaser. Three days later, Greenfield, together with one Mr. Goldman, offered ¼ per share for the entire block. Glaser declined the offer.

On March 29, A.G. Edwards lowered its asking price to 5/16. Between that date and June 5, A.G. Edwards conducted over thirty transactions through the American Stock Exchange, selling approximately ten percent of the Bank's stock for 5/16. In addition, approximately 50,000 shares were sold for ¼ per share both on May 14 and on May 17.

On June 6, 1990, Glaser sold the remaining 648,500 shares to the Greenfield–Goldman investor group for ¼ per share.[1] Summarizing his efforts, Glaser stated, "I exhausted every resource known to me as a professional in my effort to find purchas-

---

1. The stock subsequently declined to approximately 3/16 per share. Affidavit of Devin L.

Holum ¶ 12.

ers for the NEG stock at the best price available." Affidavit of Otto S. Glaser ¶ 16. Applying the total proceeds of the sales to Montle's debt, the Bank calculated a remaining deficiency of $161,908.65, plus interest of $53.23 per diem and $9,993 in legal fees.

In response, Montle offers his own affidavit. The Montle affidavit offers little, if anything, in the way of admissible *evidence;* rather, he attempts to cast a sinister light on the Bank's activities. For instance, referring to the fact that the stock was sold before June 30, the date of the restructuring, Montle states, "It is ludicrous to accelerate the sale of the shares of stock to accomodate [sic.] the owners of NEG, especially when to do so would cause a decline in the price...." Defendant's Affidavit in Support of Defendant's Opposition to Plaintiff's Motion for Summary Judgment ¶ 4. "The Plaintiff failed to obtain a reasonable price for the shares of NEG stock because of its desire to sell the stock in a short period of time, taking less than three months to sell almost 850,000 shares of stock." *Id.* ¶ 7. The only new fact that the Montle affidavit adds is the statement that Messrs. Greenfield and Goldman were "officers of NEG" or "representatives of NEG." *Id.* ¶¶ 12, 13. Montle intends to suggest, I presume, that selling the remaining block of shares to insiders was improper.

The tenor of the affidavit is best reflected in its closing paragraph: "In summary, there is a critical *conflict of fact* between the Bank and me *regarding the reasonableness of the actions taken by the Bank* in selling the shares of NEG stock." *Id.* ¶ 21 (emphasis added). The reasonableness of the actions taken by the Bank, however, is not a conflict of fact but the very question of law that the court must decide, and to which I now turn.

■ Under Texas law,[2] if a security interest secures an indebtedness, the debtor is liable for any deficiency remaining after the collateral is disposed of, Tex.Bus. &

Com.Code Ann. § 9.504(b) (Vernon 1989), provided that notice is given to the debtor and that the disposition "including the method, manner, time, place and terms must be commercially reasonable." *Id.* § 9.504(c). *See Interfirst Bank Clifton v. Fernandez,* 844 F.2d 279, 288–89 (5th Cir. 1988); *Tanenbaum v. Economics Laboratory, Inc.,* 628 S.W.2d 769, 771 (Tex. 1982). A conflict exists among Texas courts whether commercial reasonableness is an element of the plaintiff creditor's case or an affirmative defense that must be raised by the debtor. *See Smith v. FDIC,* 800 S.W.2d 648, 650 (Tex.Ct.App.1990) (collecting cases). Giving the nonmovant the benefit of the doubt and assuming that the plaintiff bears the burden of proof on this issue, I find that the Bank has established that its actions were commercially reasonable.

■ Texas law gives some guidance as to what constitutes commercial reasonableness:

> The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. If the secured party either sells the collateral in the usual manner in any recognized market therefor of if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner.

Tex.Bus. & Com.Code Ann. § 9.507(b). *See Pruske v. National Bank of Commerce,* 533 S.W.2d 931, 935 (Tex.Civ.App.1976). The efforts the Bank made to sell the stock were commercially reasonable as defined in the statute. The Bank made reasonable inquiries to NEG and among institutional investors in an attempt to find private buyers, and it made the stock available on a national market. It attempted to sell the

---

**2.** The note and security agreement provides, "This agreement will be governed by Texas law and applicable Federal law."

stock first at $^7/_{16}$, and when it was able to sell only 3,000 shares, it lowered its price to $^5/_{16}$. In over two months, it was able to sell only ten percent of the stock at that price. Rather than continue to sell shares piecemeal and slowly at the $^5/_{16}$ price, the Bank then reasonably lowered the price by $^1/_{16}$ per share and was able to dispose of the entire remaining block.

Montle offers no evidence whatsoever of what might constitute a commercially reasonable manner in which to sell stock in general or of what particular steps the Bank could have taken other than those it did take. Instead, Montle argues that if the Bank had waited longer, it could have sold the stock for a higher price. The only evidence on the record, however, shows that the price was declining and continued to decline. Montle also argues—inconsistently with his first argument—that the Bank should have sold the block of stock for $^1/_4$ when the offer was first made instead of waiting three months to accept the offer and incurring additional costs. This argument merely quarrels with the time of the sale, and it is insufficient as a matter of law to negate commercial reasonableness. Tex.Bus. & Com.Code Ann. § 9.507(b).

The common-sense comments of the *Pruske* court anticipated—and rejected—defendant's argument:

> A secured party is often placed on the horns of a dilemma. If he does sell, the debtor may complain that he should have waited for a higher offer. If he does not sell because he thinks the price might be deemed inadequate, the creditor may ultimately be obligated to sell at a lower price, in which case the debtor will possibly claim the secured party's failure to go forward with the initial sale violated commercial reasonableness.

533 S.W.2d at 937. In the present case, the Bank attempted to straddle the horns of this dilemma, and defendant now tries to impale the Bank on both.

It was clearly reasonable for the Bank to wait a few months before accepting the offer of $^1/_4$ for the entire block; this is demonstrated by the fact that the Bank *was* able to sell some of the stock at $^5/_{16}$. It was also reasonable for the Bank to accept the offer when it did. The Bank has established that it sold Montle's stock in a commercially reasonable manner, observing applicable law. It is entitled to recover the deficiency.

### III

The plaintiff Bank's motion for summary judgment in its favor on the claims in its complaint and against defendant Montle on his counterclaims is ALLOWED. The plaintiff shall submit a form of judgment, supported by affidavits or other documentation to establish with specificity the remaining deficiency, interest due and owing, and collection costs. If necessary, a hearing will be scheduled.

SO ORDERED.