NO. 07-04-0556-CV



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL D



MARCH 29, 2006


 ______________________________



GARRY LISTER, NANCY LISTER AND DORETTA MOORE, APPELLANTS



V.



LEE-SWOFFORD INVESTMENTS, L.L.P., APPELLEE


_________________________________



FROM THE 31ST DISTRICT COURT OF ROBERTS COUNTY;



NO. 1828; HONORABLE WILLIAM D. SMITH, JUDGE


_______________________________




Before QUINN, C.J., and REAVIS and CAMPBELL, JJ.

OPINION


 Appellants Garry Lister, Nancy Lister and Doretta Moore appeal a deficiency
judgment obtained against them by appellee Lee-Swofford Investments, L.L.P. We will
affirm the judgment.

 The Listers, husband and wife, were the makers of notes payable to First State
Bank of Miami, Texas, secured by liens on collateral that included the inventory and
equipment of their business Lisco Tractor Parts. Moore, Garry's Lister's mother,
guaranteed her son's indebtedness to the bank. Appellee acquired, from the bank, the
notes, the liens securing them, and Moore's guarantee. The Listers defaulted on the
notes. Appellee took possession of the inventory and equipment, and sold it at auction. 
Gross proceeds of the sale totaled $13,644. The sale netted, after expenses, $6304.19. 

 Appellee brought suit to collect the remaining balance on the notes. The Listers and
Moore asserted in their pleadings that the equipment and inventory had not been sold in
a commercially reasonable manner. They also asserted counterclaims for damages
caused by the improper disposition of the collateral. After trial to the court, judgment was
granted in favor of appellee and against the Listers and Moore for $181,629.79, plus
interest. 

 On appeal, appellants challenge the legal and factual sufficiency of the evidence
supporting the trial court's implied finding that the equipment and inventory were sold in a
commercially reasonable manner. 

Applicable Law

 Under the Business and Commerce Code, every aspect of a secured party's
disposition of collateral after default, including the method, manner, time, place and other
terms, must be commercially reasonable. Tex. Bus. & Com. Code Ann. § 9.610(b) (Vernon
2002). (1) Appellants' pleadings having raised the issue of the commercial reasonableness
of the sale of the collateral, appellee bore the burden at trial to prove that its sale was
commercially reasonable. § 9.626(a) (State Bar Committee Comment); cf. Greathouse v.
Charter Nat'l Bank-Southwest, 851 S.W.2d 173, 176-77 (Tex. 1992) (applying former §
9.504). (2) If collateral is not disposed of in a commercially reasonable manner, the liability
of a debtor or a secondary obligor for a deficiency may be limited. § 9.626(a)(3). Proof
that a greater amount could have been obtained for the collateral by its disposition at a
different time or in a different method is not alone sufficient to preclude the secured party
from establishing the disposition was commercially reasonable. § 9.627(a). But a low
sales price suggests the court should scrutinize carefully all aspects of the disposition to
insure each aspect was commercially reasonable. §§ 9.610, U.C.C. comment 10; 9.627,
U.C.C. comment 2. 

 The issue of the commercial reasonableness of a disposition of collateral is
inherently one of fact. Havins v. First Nat'l Bank of Paducah, 919 S.W.2d 177, 181
(Tex.App.-Amarillo 1996, no writ). (3) The Business and Commerce Code provides a non-exclusive list of commercially reasonable dispositions, which include those made "in
conformity with reasonable commercial practices among dealers in the type of property that
was the subject of the disposition." § 9.627(b)(3). Courts have considered any number of
factors to evaluate the commercial reasonableness of a disposition of collateral, including
whether the secured party endeavored to obtain the best price possible, whether the sale
was private or public, the condition of the collateral and any efforts made to enhance its
condition, the advertising undertaken, the number of bids received and the method
employed in soliciting bids. See Havins, 919 S.W.2d at 181-82 (enumerating factors);
Pruske v. National Bank of Commerce of San Antonio, 533 S.W.2d 931, 937
(Tex.Civ.App.-San Antonio 1976, no writ) (same). 

 Neither party requested findings of fact and conclusions of law following the trial
court's decision. In a non-jury trial, where no findings of fact or conclusions of law are filed
or requested, it is implied that the trial court made all the necessary findings to support its
judgment. Roberson v. Robinson, 768 S.W.2d 280, 281 (Tex. 1989). When, however, as
here, a reporter's record is provided, the sufficiency of the evidence to support implied
findings of fact may be challenged. Id.; In re Williams, 998 S.W.2d 724, 729
(Tex.App.-Amarillo 1999, no pet.). A judgment based on implied findings that are
supported by sufficient evidence is to be affirmed on any applicable theory of law. See
Point Lookout West, Inc. v. Whorton, 742 S.W.2d 277, 278 (Tex. 1987).

 A legal sufficiency point will be sustained when: (a) there is a complete absence of
evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving
weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove
a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the
opposite of a vital fact. Merrell Dow Pharm., Inc. v. Havner, 953 S.W. 2d 706, 711 (Tex.
1997). Appellants' legal sufficiency point is couched as a conclusive evidence point, by
which appellants assert that the evidence adduced affirmatively establishes that appellee's
sale of the collateral was not commercially reasonable. Reviewing the conclusive evidence
point, we must determine whether the evidence as a whole rises to a level that reasonable
people could not differ in their conclusions concerning the commercial reasonableness of
the sale. City of Keller v. Wilson, 168 S.W.3d 802, 815-16 (Tex. 2005); Uniroyal Goodrich
Tire Co. v. Martinez, 977 S.W.2d 328, 340 (Tex. 1998).

 Considering appellants' factual sufficiency challenge, we will consider and weigh all
of the evidence, and may set the trial court's finding aside only if it is so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust. Maritime Overseas
Corp. v. Ellis, 971 S.W.2d 402, 406-07 (Tex. 1998); Cain v. Bain, 709 S.W.2d 175, 176
(Tex. 1986). 

Analysis

 In support of their contention the evidence of commercial reasonableness of the
sale is legally insufficient, appellants assert that this court's opinion in Havins, 919 S.W.2d
at 177, is dispositive. They point to the language in that opinion concluding the evidence
presented in a commercial reasonableness case must describe the method, manner, time,
place and terms of the sale. Id. at 181. 

 Havins dealt with a challenge to the commercial reasonableness of a sale of cattle. 
The opinion indicates that evidence regarding disposition of the cattle was limited to facts
showing they were in poor condition when the bank took possession of them and that
within six weeks they were sold at "a large cow sale, stocker sale" at which similar cattle
were sold, and showing the amount of proceeds received by the bank. 919 S.W.2d at 181-82. We found the evidence factually insufficient, noting the absence of any evidence of
such matters as the condition of the cattle at the time of sale, how they were grouped, the
number of bidders, how the sale was advertised, the reputation and business practices of
the auction and the relation of the price received to general market prices. We said that
evidence the cattle were sold through an auction was not sufficient to establish the method,
manner, time, place and terms of the disposition. Id. at 182. 

 One witness described Lisco's business as a used tractor parts dealership. (4) Its
equipment and parts inventory were sold for cash by auction conducted by Five Star
Auctioneers of Plainview, Texas, on Saturday, January 19, 2002, at Lisco's business
premises in Miami. The advertising conducted in advance of the auction is fully described
in the evidence. Something over 80 people registered at the auction. Witnesses at trial
included Mervin Evans, a Five Star auctioneer and partner, and others who attended. 
Evans described how the day-long auction was conducted, testifying that some items were
sold individually, others by lot. Other witnesses also described the manner of sale. The
record includes the receipts for each individual sale at the auction. Evans also described
the several days of work that was performed to clean the premises and organize the
inventory for auction. The evidence concerning the disposition of the collateral here far
exceeds the meager facts presented in Havins. It thoroughly describes the method,
manner, time, place and terms of the disposition.

 Lisco's parts inventory included some new tractor parts and some rebuilt parts, but
consisted largely of parts obtained by dismantling salvage tractors Lisco bought for that
purpose. The collateral also included many items useful only for scrap, such as the bodies
of dismantled tractors. Part of the inventory was contained in the three buildings located
on Lisco's eight-acre property; other items such as tractor bodies and tires were outside. 

 The trial court heard widely varying evidence concerning the nature and market
value of Lisco's inventory. Garry Lister testified that, sold at his retail sales prices, his
inventory would have brought more than a million dollars. He acknowledged that some
discount would apply to sales to other dealers. Inventory lists and financial statements
Lister had given the bank at different times showed values ranging from $162,000, based
on his cost, to some $769,000, based on his retail sales prices. The bank obtained an
appraisal dated in March 2001 that placed a market value on Lisco's "inventory and
contents" of $125,000. Robert Owens, a long-time owner of a large tractor and auto parts
salvage business in Wellington, Texas, who attended the auction, testified the inventory
should have brought several times the $13,644 gross proceeds, and agreed $84,000 would
"probably be in the ball park." But Owens also testified that he had discussed with Garry
Lister the possibility of participating in an offer to appellee for purchase of the inventory and
the real estate (5) for a total of $100,000, which Owens also termed a "fair price." 

 Arguing the evidence conclusively establishes that the sale was not commercially
reasonable, appellants also point to testimony of appellee's principals Glenn Lee and
Duane Swofford acknowledging they had no experience disposing of collateral of this
nature, and based their decisions concerning its disposition on the advice they received
from Five Star. (6) 

 Appellants rely also on Owens' testimony, and that of Henry Teich, who acquired
some tractor parts at bargain prices at the auction. Teich, who lives near Fort Worth, said
he came to the auction interested in a particular gear assembly for a Case tractor, and
ended up buying eight of the gear assemblies because "they were so cheap." He won the
bidding on several shelves of parts that were sold as lots. One shelf contained two of the
gear assemblies together with many other parts. The used gear assemblies alone would
have cost him $1000 each had he purchased them at a tractor parts dealer. He paid $150
or less for the entire shelf of parts. Teich also testified he bought, as a lot, 26 injection
pumps for $143. He later resold 25 of the pumps to a friend in the injection pump business
for $100 each. 

 Robert Owens also found many bargains. He bought at least ten trailer loads of
parts that he placed into his own inventory, and several truck loads of scrap, spending less
than $2000 in all. He resold the scrap for more than $10,000. In one of his successful
bids, Owens bought a row of ten or twelve "piece tractors," those missing the motor or
other parts, for $1. He estimated his resale value of the parts inventory and salvage from
those piece tractors at between five and ten thousand dollars. 

 Both Teich and Owens expressed the opinion that an auction like that conducted
here was not the proper way to sell such items. (7) Garry Lister, who did not attend the
auction, expressed a similar opinion. (8) Evans testified the sale was commercially
reasonable. He said there was nothing Five Star could have done to make the auction
"better." He testified that transporting the inventory to parts dealers to seek a buyer was
not feasible because of the expense and labor required, and that the widespread
advertising provided "a chance for a lot of people to see it . . . ." Lee testified that, based
on what he was told, he thought most of the inventory was "junk," and that appellee wanted
to sell it in the fastest, most efficient way. Swofford said he "wanted to get it sold at the
fairest price we could get." 

 Appellants' contention focuses on the absence of a larger number of parts dealers
among the bidders. Appellants criticize the auction as a "farm sale." They do not contend
on appeal that the auction's format, date, time or location rendered it commercially
unreasonable, nor do they criticize the conduct of the auction company. (9) The gist of their
argument is that the sales proceeds would have been greater if bidders like Owens and
Teich had faced greater competition from other interested bidders. Owens testified Lisco's
inventory "would have brought a lot more money if more people in my line of business
would have been there." Competition has been recognized as the means to obtaining a
fair price at a public auction. Kolbo v. Blair, 379 S.W.2d 125, 129 (Tex.Civ.App.-Corpus
Christi 1964, writ ref'd n.r.e.). Under Article Nine, a "public" disposition is "one at which the
price is determined after the public has had a meaningful opportunity for competitive
bidding." § 9.610, comment 7. (10) Commercial reasonableness may call for advertising
particular collateral in trade publications. See Liberty Nat'l Bank & Trust Co. v. Acme Tool
Div., 540 F.2d 1375, 1381 (10th Cir. 1976) (citing bank's failure to advertise oil rig in trade
journals). 

 The auction was advertised in the Amarillo newspaper, and those of Pampa, Borger
and other area towns. It was advertised also in the High Plains Journal, a Kansas
publication Evans testified is distributed over several states. The auction was further
advertised, together with other scheduled Five Star auctions, in the company's auction
circular, mailed to some 28,000 recipients. Evans testified 128 more circulars were mailed
to individuals and dealers at addresses obtained from Lisco's mailing list and from trade
magazines found at Lisco's offices. The circular's page-sized advertisement described the
auction as selling the real estate, equipment and tractor parts of a "large tractor salvage
co., thousands and thousands of parts." It contained lists further describing the parts and
other items to be sold. 

 Owens testified that he was the only parts dealer at the auction, (11) and that other
dealers should have been invited to the sale. He specifically mentioned parts dealers in
several Texas cities and others in Oklahoma. Owens also testified, though, that he
received the circular advertising the Lisco auction, that Five Star "does lots of advertising,"
and that he had advertised his own business in their brochures. Evans's testimony and the
list of 128 addresses to which circulars were mailed indicate that a number of other parts
dealers, including three of those specifically mentioned by Owens, received circulars. 
Other testimony provided a possible explanation for a lack of interest on the part of some
dealers. Garry Lister testified he contacted several dealers during the months before
appellees took possession of his inventory, but those dealers were "pretty much stocked
up at the time." Owens also acknowledged that, if sale prices had been higher, he
"probably wouldn't have been as good a buyer." Evans testified that a low price for scrap
metal "greatly" affected the bids received for scrap items. 

 Testimony indicates the collateral auctioned varied from the parts having values like
those described by Teich, to scrap like that bought and resold by Owens, to items that
were purchased at the auction but still had not been removed from the Lisco property by
the time of trial. 

 Although the proceeds obtained from the auction seem low, (12) we cannot agree that
appellee's inexperience in disposition of this type of collateral or the failure of many parts
dealers to attend the auction despite wide advertising conclusively establishes the
disposition of the inventory was commercially unreasonable. We conclude that, on the
evidence presented, reasonable people could differ in their conclusions concerning the
commercial reasonableness of the auction of Lisco's inventory. City of Keller, 168 S.W.3d
at 816. In this bench trial, the trial court was the sole judge of the credibility of the
witnesses and the weight to be given their testimony. Sterquell v. Scott, 140 S.W.3d 453,
461 (Tex.App.-Amarillo 2004, no pet.). We also conclude that the trial court's implied
finding that appellee's disposition of the collateral was commercially reasonable is not so
contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. 
Maritime Overseas Corp., 971 S.W.2d at 406-07. Accordingly, we find the evidence
supporting that finding both legally and factually sufficient, and overrule appellants' issues
contending otherwise. The trial court's judgment is affirmed.

 



 James T. Campbell

 Justice
1. All citations to sections in this opinion are to Tex. Bus. & Com. Code Ann. (Vernon
2002). Texas adopted a revised Article Nine (entitled Uniform Commercial Code-Secured
Transactions), effective July 1, 2001. § 9.101 et. seq. The revised law is applicable to
appellee's deficiency action, filed May 13, 2002. §§ 9.701, 9.702. Section 9.610 of the
revised law retains the requirement that disposition of collateral be commercially
reasonable, stated in § 9.504(c) of the prior statute. 
2. The sufficiency of appellee's notification of its intended disposition of the collateral
is not at issue. 
3. Like former § 9.504, § 9.610 does not define the term commercially reasonable.
Case law applying the term under former Article Nine should generally remain applicable. 

4. It was elsewhere described as a large tractor salvage company. Lisco sold tractor
parts to farmers and other individuals. Garry Lister testified that Lisco also sold parts to
dealers in other states through a network of salvage dealers. He also testified he received
invitations to bid on inventory items being offered by other dealers. 
5. Appellee previously had purchased the real estate for $75,000 at a nonjudicial
foreclosure. The commercial reasonableness of that sale is not challenged. The real
estate was offered at the auction, but no acceptable bid was received.
6. Swofford said he was "not in the parts business, he was in the note business."
7. Teich proposed that the best price for the inventory would have been obtained by
an effort to market the different categories of parts to specialized buyers, giving his
success in selling the injection pumps as an example. He acknowledged that effort could
take months. He also opined that some items could have been marketed over the internet.
8. Garry Lister testified that the collateral should have been marketed to other parts
dealers, not to farmers, who typically are interested in buying only a single part. 
9. Five Star partner Evans testified that Five Star conducts about 80 auctions a year,
over a large area of west Texas, mostly "farm related." Owens called Five Star "very good
auctioneers."
10. Comment 7 goes on to state that a "meaningful opportunity" implies that "some
form of advertisement or public notice must precede the sale . . . and that the public must
have access to the sale . . . ." Id.
11. Teich testified there were two parts dealers at the auction. Teich also said two
other bidders, "a gentleman from Arkansas and a local . . . salvage dealer," bid on parts
he bought. 
12. See § 9.627, U.C.C. comment 2, noting "[t]he law long has grappled with the
problem of dispositions of . . . property which comply with applicable procedural
requirements (e.g., advertising, notification to interested persons, etc.) but which yield a
price that seems low."