NO. 07-04-0556-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL D

MARCH 29, 2006

______________________________

GARRY LISTER, NANCY LISTER AND DORETTA MOORE, APPELLANTS

V.

LEE-SWOFFORD INVESTMENTS, L.L.P., APPELLEE

_________________________________

FROM THE 31
ST
 DISTRICT COURT OF ROBERTS COUNTY;

NO. 1828; HONORABLE WILLIAM D. SMITH, JUDGE

_______________________________

Before QUINN, C.J., and REAVIS and CAMPBELL, JJ.

OPINION

Appellants Garry Lister, Nancy Lister and Doretta Moore appeal a deficiency judgment obtained against them by appellee Lee-Swofford Investments, L.L.P. We will affirm the judgment.

The Listers, husband and wife, were the makers of notes payable to First State Bank of Miami, Texas, secured by liens on collateral that included the inventory and equipment of their business Lisco Tractor Parts.  Moore, Garry’s Lister’s mother, guaranteed her son’s indebtedness to the bank.  Appellee acquired, from the bank, the notes, the liens securing them, and Moore’s guarantee.  The Listers defaulted on the notes.  Appellee took possession of the inventory and equipment, and sold it at auction.  Gross proceeds of the sale totaled $13,644.  The sale netted, after expenses, $6304.19. 

Appellee brought suit to collect the remaining balance on the notes.  The Listers and Moore asserted in their pleadings that the equipment and inventory had not been sold in a commercially reasonable manner.  They also asserted counterclaims for damages caused by the improper disposition of the collateral.  After trial to the court, judgment was granted in favor of appellee and against the Listers and Moore for $181,629.79, plus interest. 

On appeal, appellants challenge the legal and factual sufficiency of the evidence supporting the trial court’s implied finding that the equipment and inventory were sold in a commercially reasonable manner. 

Applicable Law

Under the Business and Commerce Code, every aspect of a secured party’s disposition of collateral after default, including the method, manner, time, place and other terms, must be commercially reasonable.  Tex. Bus. & Com. Code Ann. § 9.610(b) (Vernon 2002).
(footnote: 1)  Appellants’ pleadings having raised the issue of the commercial reasonableness of the sale of the collateral, appellee bore the burden at trial to prove that its sale was commercially reasonable. 
§ 9.626(a) (State Bar Committee Comment); 
cf. Greathouse v. Charter Nat’l Bank-Southwest
, 851 S.W.2d 173, 176-77 (Tex. 1992) (applying former § 9.504).
(footnote: 2)  If collateral is not disposed of in a commercially reasonable manner, the liability of a debtor or a secondary obligor for a deficiency may be limited.  § 9.626(a)(3).  Proof that a greater amount could have been obtained for the collateral by its disposition at a different time or in a different method is not alone sufficient to preclude the secured party from establishing the disposition was commercially reasonable.  § 9.627(a).  But a low sales price suggests the court should scrutinize carefully all aspects of the disposition to insure each aspect was commercially reasonable.  §§ 9.610, U.C.C. comment 10; 9.627, U.C.C. comment 2. 

The issue of the commercial reasonableness of a disposition of collateral is inherently one of fact.  
Havins v. First Nat’l Bank of Paducah
, 919 S.W.2d 177, 181 (Tex.App.–Amarillo 1996, no writ).
(footnote: 3)  The Business and Commerce Code provides a non-exclusive list of commercially reasonable dispositions, which include those made “in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition.” § 9.627(b)(3).  Courts have considered any number of factors to evaluate the commercial reasonableness of a disposition of collateral, including whether the secured party endeavored to obtain the best price possible, whether the sale was private or public, the condition of the collateral and any efforts made to enhance its condition, the advertising undertaken, the number of bids received and the method employed in soliciting bids.  
See
 
Havins
, 919 S.W.2d at 181-82 (enumerating factors); 
Pruske v. National Bank of Commerce of San Antonio
, 533 S.W.2d 931, 937 (Tex.Civ.App.–San Antonio 1976, no writ) (same).      

Neither party requested findings of fact and conclusions of law following the trial court's decision.  In a non-jury trial, where no findings of fact or conclusions of law are filed or requested, it is implied that the trial court made all the necessary findings to support its judgment.  
Roberson v. Robinson
, 768 S.W.2d 280, 281 (Tex. 1989). When, however, as here, a reporter's record is provided, the sufficiency of the evidence to support implied findings of fact may be challenged. 
Id.
; 
In re Williams
, 998 S.W.2d 724, 729 (Tex.App.–Amarillo 1999, no pet.). A judgment based on implied findings that are supported by sufficient evidence is to be affirmed on any applicable theory of law. 
See Point Lookout West, Inc. v. Whorton
, 742 S.W.2d 277, 278 (Tex. 1987).

A legal sufficiency point will be sustained when: (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of a vital fact.  
Merrell Dow Pharm., Inc. v. Havner
, 953 S.W. 2d 706, 711 (Tex. 1997).  Appellants’ legal sufficiency point is couched as a conclusive evidence point, by which appellants assert that the evidence adduced affirmatively establishes that appellee’s sale of the collateral was not commercially reasonable.  Reviewing the conclusive evidence point, we must determine whether the evidence as a whole rises to a level that reasonable people could not differ in their conclusions concerning the commercial reasonableness of the sale.  
City of Keller v. Wilson
, 168 S.W.3d 802, 815-16 (Tex. 2005); 
Uniroyal Goodrich Tire Co. v. Martinez
, 977 S.W.2d 328, 340 (Tex. 1998).

Considering appellants’ factual sufficiency challenge, we will consider and weigh all of the evidence, and may set the trial court’s finding aside only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. 
Maritime Overseas Corp. v. Ellis
, 971 S.W.2d 402, 406-07 (Tex. 1998); 
Cain v. Bain
, 709 S.W.2d 175, 176 (Tex. 1986).  

Analysis

In support of their contention the evidence of commercial reasonableness of the sale is legally insufficient, appellants assert that this court’s opinion in 
Havins
, 919 S.W.2d at 177, is dispositive.  They point to the language in that opinion concluding the evidence presented in a commercial reasonableness case must describe the method, manner, time, place and terms of the sale. 
Id
. at 181. 

Havins
 dealt with a challenge to the commercial reasonableness of a sale of cattle.  The opinion indicates that evidence regarding disposition of the cattle was limited to facts showing they were in poor condition when the bank took possession of them and that within six weeks they were sold at “a large cow sale, stocker sale” at which similar cattle were sold, and showing the amount of proceeds received by the bank.  919 S.W.2d at 181-82.  We found the evidence factually insufficient, noting the absence of any evidence of such matters as the condition of the cattle at the time of sale, how they were grouped, the number of bidders, how the sale was advertised, the reputation and business practices of the auction and the relation of the price received to general market prices.  We said that evidence the cattle were sold through an auction was not sufficient to establish the method, manner, time, place and terms of the disposition.  
Id
. at 182. 

One witness described Lisco’s business as a used tractor parts dealership.
(footnote: 4)  Its equipment and parts inventory were sold for cash by auction conducted by Five Star Auctioneers of Plainview, Texas, on Saturday, January 19, 2002, at Lisco’s business premises in Miami.  The advertising conducted in advance of the auction is fully described in the evidence.  Something over 80 people registered at the auction.  Witnesses at trial included Mervin Evans, a Five Star auctioneer and partner, and others who attended.  Evans described how the day-long auction was conducted, testifying that some items were sold individually, others by lot.  Other witnesses also described the manner of sale.  The record includes the receipts for each individual sale at the auction.  Evans also described the several days of work that was performed to clean the premises and organize the inventory for auction.  The evidence concerning the disposition of the collateral here far exceeds the meager facts presented in 
Havins
.  It thoroughly describes the method, manner, time, place and terms of the disposition.

Lisco’s parts inventory included some new tractor parts and some rebuilt parts, but consisted largely of parts obtained by dismantling salvage tractors Lisco bought for that purpose.  The collateral also included many items useful only for scrap, such as the bodies of dismantled tractors.  Part of the inventory was contained in the three buildings located on Lisco’s eight-acre property; other items such as tractor bodies and tires were outside. 

The trial court heard widely varying evidence concerning the nature and market value of Lisco’s inventory.  Garry Lister testified that, sold at his retail sales prices, his inventory would have brought more than a million dollars.  He acknowledged that some discount would apply to sales to other dealers.  Inventory lists and financial statements Lister had given the bank at different times showed values ranging from $162,000, based on his cost, to some $769,000, based on his retail sales prices.  The bank obtained an appraisal dated in March 2001 that placed a market value on Lisco’s “inventory and contents” of $125,000.  Robert Owens, a long-time owner of a large tractor and auto parts salvage business in Wellington, Texas, who attended the auction, testified the inventory should have brought several times the $13,644 gross proceeds, and agreed $84,000 would “probably be in the ball park.”  But Owens also testified that he had discussed with Garry Lister the possibility of participating in an offer to appellee for purchase of the inventory and the real estate
(footnote: 5) for a total of $100,000, which Owens also termed a “fair price.”     

Arguing the evidence conclusively establishes that the sale was not commercially reasonable, appellants also point to testimony of appellee’s principals Glenn Lee and Duane Swofford acknowledging they had no experience disposing of collateral of this nature, and based their decisions concerning its disposition on the advice they received from Five Star.
(footnote: 6)  

Appellants rely also on Owens’ testimony, and that of Henry Teich, who acquired some tractor parts at bargain prices at the auction.  Teich, who lives near Fort Worth, said he came to the auction interested in a particular gear assembly for a Case tractor, and ended up buying eight of the gear assemblies because “they were so cheap.”  He won the bidding on several shelves of parts that were sold as lots.  One shelf contained two of the gear assemblies together with many other parts.  The used gear assemblies alone would have cost him $1000 each had he purchased them at a tractor parts dealer.  He paid $150 or less for the entire shelf of parts.  Teich also testified he bought, as a lot, 26 injection pumps for $143.  He later resold 25 of the pumps to a friend in the injection pump business for $100 each. 

Robert Owens also found many bargains.  He bought at least ten trailer loads of parts that he placed into his own inventory, and several truck loads of scrap, spending less than $2000 in all.  He resold the scrap for more than $10,000.  In one of his successful bids, Owens bought a row of ten or twelve “piece tractors,” those missing the motor or other parts, for $1.  He estimated his resale value of the parts inventory and salvage from those piece tractors at between five and ten thousand dollars. 

Both Teich and Owens expressed the opinion that an auction like that conducted here was not the proper way to sell such items.
(footnote: 7)  Garry Lister, who did not attend the auction, expressed a similar opinion.
(footnote: 8)  Evans testified the sale was commercially reasonable.  He said there was nothing Five Star could have done to make the auction “better.”  He testified that transporting the inventory to parts dealers to seek a buyer was not feasible because of the expense and labor required, and that the widespread advertising provided “a chance for a lot of people to see it . . . .” Lee testified that, based on what he was told, he thought most of the inventory was “junk,” and that appellee wanted to sell it in the fastest, most efficient way.  Swofford said he “wanted to get it sold at the fairest price we could get.”        

Appellants’ contention focuses on the absence of a larger number of parts dealers among the bidders.  Appellants criticize the auction as a “farm sale.” They do not contend on appeal that the auction’s format, date, time or location rendered it commercially unreasonable, nor do they criticize the conduct of the auction company.
(footnote: 9) The gist of their argument is that the sales proceeds would have been greater if bidders like Owens and Teich had faced greater competition from other interested bidders. Owens testified Lisco’s inventory “would have brought a lot more money if more people in my line of business would have been there.”  Competition has been recognized as the means to obtaining a fair price at a public auction.  
Kolbo v. Blair
, 379 S.W.2d 125, 129 (Tex.Civ.App.–Corpus Christi 1964, writ ref’d n.r.e.).  Under Article Nine, a “public” disposition is “one at which the price is determined after the public has had a meaningful opportunity for competitive bidding.” § 9.610, comment 7.
(footnote: 10)  Commercial reasonableness may call for advertising particular collateral in trade publications.  
See Liberty Nat’l Bank & Trust Co. v. Acme Tool Div.
, 540 F.2d 1375, 1381 (10
th
 Cir. 1976) (citing bank’s failure to advertise oil rig in trade journals). 

The auction was advertised in the Amarillo newspaper, and those of Pampa, Borger and other area towns.  It was advertised also in the High Plains Journal, a Kansas publication Evans testified is distributed over several states.  The auction was further advertised, together with other scheduled Five Star auctions, in the company’s auction circular, mailed to some 28,000 recipients.  Evans testified 128 more circulars were mailed to individuals and dealers at addresses obtained from Lisco’s mailing list and from trade magazines found at Lisco’s offices.  The circular’s page-sized advertisement described the auction as selling the real estate, equipment and tractor parts of a “large tractor salvage co., thousands and thousands of parts.”  It contained lists further describing the parts and other items to be sold.      

Owens testified that he was the only parts dealer at the auction,
(footnote: 11) and that other dealers should have been invited to the sale.  He specifically mentioned parts dealers in several Texas cities and others in Oklahoma.  Owens also testified, though, that he received the circular advertising the Lisco auction, that Five Star “does lots of advertising,” and that he had advertised his own business in their brochures.  Evans’s testimony and the list of 128 addresses to which circulars were mailed indicate that a number of other parts dealers, including three of those specifically mentioned by Owens, received circulars.  Other testimony provided a possible explanation for a lack of interest on the part of some dealers.  Garry Lister testified he contacted several dealers during the months before appellees took possession of his inventory, but those dealers were “pretty much stocked up at the time.”  Owens also acknowledged that, if sale prices had been higher, he “probably wouldn’t have been as good a buyer.”  Evans testified that a low price for scrap metal “greatly” affected the bids received for scrap items.   

Testimony indicates the collateral auctioned varied from the parts having values like those described by Teich, to scrap like that bought and resold by Owens, to items that were purchased at the auction but still had not been removed from the Lisco property by the time of trial. 

Although the proceeds obtained from the auction seem low,
(footnote: 12) we cannot agree that appellee’s inexperience in disposition of this type of collateral or the failure of many parts dealers to attend the auction despite wide advertising conclusively establishes the disposition of the inventory was commercially unreasonable.  We conclude that, on the evidence presented, reasonable people could differ in their conclusions concerning the commercial reasonableness of the auction of Lisco’s inventory.  
City of Keller
, 168 S.W.3d at 816.  In this bench trial, the trial court was the sole judge of the credibility of the witnesses and the weight to be given their testimony.  
Sterquell v. Scott
, 140 S.W.3d 453, 461 (Tex.App.–Amarillo 2004, no pet.).  We also conclude that the trial court’s implied finding that appellee’s disposition of the collateral was commercially reasonable is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.
  Maritime Overseas Corp.
, 971 S.W.2d at 406-07.  Accordingly, we find the evidence supporting that finding both legally and factually sufficient, and overrule appellants’ issues contending otherwise.  The trial court’s judgment is affirmed.

James T. Campbell

        Justice

FOOTNOTES
1: All citations to sections in this opinion are to Tex. Bus. & Com. Code Ann. (Vernon 2002).  Texas adopted a revised Article Nine (entitled Uniform Commercial Code–Secured Transactions), effective July 1, 2001.  § 9.101 
et. seq.
  The revised law is applicable to appellee’s deficiency action, filed May 13, 2002.  §§ 9.701, 9.702.  Section 9.610 of the revised law retains the requirement that disposition of collateral be commercially reasonable, stated in § 9.504(c) of the prior statute. 

2: The sufficiency of appellee’s notification of its intended disposition of the collateral is not at issue.  

3: Like former § 9.504, § 9.610 does not define the term commercially reasonable. Case law applying the term under former Article Nine should generally remain applicable.  

4: It was elsewhere described as a large tractor salvage company. Lisco sold tractor parts to farmers and other individuals.  Garry Lister testified that Lisco also sold parts to dealers in other states through a network of salvage dealers.  He also testified he received invitations to bid on inventory items being offered by other dealers.  

5: Appellee previously had purchased the real estate for $75,000 at a nonjudicial foreclosure.  The commercial reasonableness of that sale is not challenged.  The real estate was offered at the auction, but no acceptable bid was received.

6: Swofford said he was “not in the parts business, he was in the note business.”

7: Teich proposed that the best price for the inventory would have been obtained by an effort to market the different categories of parts to specialized buyers, giving his success in selling the injection pumps as an example.  He acknowledged that effort could take months.  He also opined that some items could have been marketed over the internet.

8: Garry Lister testified that the collateral should have been marketed to other parts dealers, not to farmers, who typically are interested in buying only a single part.  

9: Five Star partner Evans testified that Five Star conducts about 80 auctions a year, over a large area of west Texas, mostly “farm related.” Owens called Five Star “very good auctioneers.”

10: Comment 7 goes on to state that a “meaningful opportunity” implies that “some form of advertisement or public notice must precede the sale . . . and that the public must have access to the sale . . . .”  
Id
.

11: Teich testified there were two parts dealers at the auction.  Teich also said two other bidders, “a gentleman from Arkansas and a local . . . salvage dealer,” bid on parts he bought.   

12: 
See
 § 9.627, U.C.C. comment 2, noting “[t]he law long has grappled with the problem of dispositions of . . . property which comply with applicable procedural requirements (e.g., advertising, notification to interested persons, etc.) but which yield a price that seems low.”