**AFFIRM in part; REVERSE in part and REMAND and Opinion Filed December 19, 2022**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-21-00769-CV**

**LARRY K. ANDERS, Appellant**
**V.**
**CROSSFIRST BANK, A KANSAS STATE BANK, Appellee**

**On Appeal from the 429th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 429-05551-2018**

## MEMORANDUM OPINION

Before Justices Reichek, Goldstein, and Smith
Opinion by Justice Smith

Larry K. Anders appeals from the trial court's final summary judgment in favor of CrossFirst Bank, a Kansas State Bank, on its suit for breach of guaranty agreements and Anders's counterclaim for breach of fiduciary duty. In four issues, Anders argues the trial court erred in granting summary judgment in favor of CrossFirst and in its award of attorneys' fees, costs, and expenses. For the following reasons, we affirm the trial court's judgment in part, reverse the judgment in part, and remand this case to the trial court for further proceedings.

## Background

In August 2016, Anders and Jonathan Collura formed SAF Capital Partners, LLC, a private equity investment company. Collura managed SAF Capital's day-to-day activities; Anders, who is in the life insurance distribution business, was a silent partner. Collura identified LO Transport, Inc., an oilfield trucking services business, as an acquisition target and proceeded to secure financing to facilitate the acquisition.

On February 15, 2017, LO Transport and CrossFirst entered into two promissory notes and a revolving line of credit note whereby LO Transport agreed to repay loans totaling approximately $6,000,000. The parties also executed a loan and security agreement, which secured LO Transport's debts to CrossFirst by encumbering LO Transport's personal property and set forth CrossFirst's remedies in the event of default. Pursuant to the loan and security agreement, Anders was a guarantor of LO Transport's debts to CrossFirst. CrossFirst and Anders also executed a guaranty agreement in which Anders agreed to "be liable as a primary obligor for the payment and performance" of LO Transport's obligations to CrossFirst. He further agreed to pay "all costs, attorneys' fees and expenses incurred or expended" by CrossFirst in collecting on the amounts owed by LO Transport or in enforcing CrossFirst's rights under the guaranty agreement.

On October 4, 2017, CrossFirst and LO Transport entered into a third promissory note for the repayment of a loan for $182,424. On the same date, Anders

signed a guaranty agreement wherein he agreed, as he had for the previous notes, to guaranty prompt payment and performance of the loan.

Between October 2017 and May 2018, the parties modified the promissory notes, deferring certain monthly principal payments and allowing interest-only payments, and increased the revolving line of credit note from $1,000,000 to $1,500,000. Anders signed modification documents confirming and reaffirming his guaranty obligations.

LO Transport failed to make required payments under the notes. On September 10, 2018, CrossFirst employees Craig Nichols and John Billings traveled to LO Transport's yard in Pleasanton to observe its property and discuss LO Transport's financial condition. Collura was to provide information to Nichols, and there was some discussion about developing a plan to manage the situation. However, on or around September 25, 2018, CrossFirst sent LO Transport a demand letter. The letter notified LO Transport that it was in default and, if the default was not cured within fifteen days, CrossFirst would pursue its contractual remedies. Anders received a copy of the demand letter. LO Transport never cured the default, and Anders made no payment to CrossFirst under the guaranty agreements.

In late September or early October 2018, Nichols visited the yard without Collura's consent and met with Joe Gayanich, a recently-hired yard manager. According to Collura, CrossFirst representatives "effectively took control of operations" at the yard. Gayanich notified LO Transport customers that CrossFirst

–3–

now owned equipment the customers were storing in the yard. According to Collura, this "absolutely crushed" LO Transport's business.

On October 22, 2018, CrossFirst brought this action against LO Transport, SAF Oilfield I, LLC, Collura, and Anders to recover on the promissory notes and guaranty agreements.[1] CrossFirst also retained Mark A. Jackson, an energy industry advisor, to consult with respect to the collection and evaluation of collateral. In late October, Jackson made two trips to the yard to assess, inventory, and institute measures to help secure the collateral, including chaining all entrances and replacing existing locks.

On November 1, 2018, LO Transport filed for Chapter 7 bankruptcy. On December 10, 2018, the bankruptcy court entered an agreed order granting CrossFirst relief from the bankruptcy stay and authorizing it to enforce its rights and remedies, including foreclosure and repossession of LO Transport's collateral and pursuit of any additional state law remedies and remedies under the loan documents.

In an amended petition, filed February 8, 2019, CrossFirst sought the appointment of Jackson as a receiver to, among other things, ensure the orderly receipt and distribution of LO Transport's property to fund CrossFirst's claims. In March 2019, the trial court entered an order granting the application and appointing

---

[1] CrossFirst also alleged a number of other claims against Collura. CrossFirst subsequently dismissed its claims against all defendants except Anders.

Jackson as receiver. Pursuant to the order, Jackson could sell receivership collateral upon the trial court's approval.

In April 2019, the trial court signed an order authorizing Jackson to sell the personal property of the receivership collateral by public auction. The order further provided for Jackson to distribute auction proceeds to CrossFirst "as soon as [he] receive[d] such funds and the sale [was] final pursuant to an order confirming sale issued" by the trial court. The auction, which occurred on June 12, 2019, generated approximately $912,221 in gross sales proceeds. Jackson subsequently reported to the trial court that he had transferred $625,000 of the net proceeds from the auction to CrossFirst. According to David C. Williams, Managing Partner and Dallas President of CrossFirst, CrossFirst subsequently received another approximately $175,000 in net proceeds.

In April 2020, CrossFirst filed a motion for summary judgment against Anders on its claim for breach of the guaranty agreements. CrossFirst sought damages in the amount of $3,319,921.88, the deficiency remaining due on Anders's obligation after applying the proceeds recouped for collateral through the auction and insurance. CrossFirst noted in the motion that it also sought attorneys' fees, costs, and expenses incurred in pursuing the litigation and collection activities, which it would prove up by a separate hearing.

In May 2020, Anders filed an amended answer, which included a specific denial and affirmative defense alleging that CrossFirst's collection and disposition

of the loan collateral was not completed in a commercially reasonable manner. In June 2020, CrossFirst supplemented its summary judgment motion, arguing, among other things, that the collection and disposition was commercially reasonable as a matter of law.

In July 2020, the trial court entered an order granting the summary judgment motion, as supplemented, and awarding CrossFirst the damages it requested. CrossFirst then filed a motion to recover attorneys' fees, costs, and expenses that it alleged it was contractually and statutorily entitled to in connection with the summary judgment. The trial court held a short hearing on the motion and, thereafter, granted the motion, ordering that CrossFirst was entitled to recover $350,039.65 in reasonable and necessary attorneys' fees, expenses, and court costs for prosecuting its claims against Anders and $652,443.90 in collection and disposition expenses.

In March 2021, Anders filed a counterclaim, asserting a cause of action for breach of fiduciary duty against CrossFirst. Anders alleged that CrossFirst "became a *de facto* partner in the LO Transport business venture" by virtue of its conduct in or around early October 2018" and breached its fiduciary duties "by using its control over LO Transport's business to, among other things, steal equipment from LO Transport and interfere with its customer relationships, which destroyed LO Transport's business and ultimately caused the company to file for Chapter 7 bankruptcy." CrossFirst subsequently moved for summary judgment on the

counterclaim, asserting there was no genuine issue of material fact as to whether CrossFirst owed a fiduciary duty because Anders had contractually disclaimed any fiduciary relationship. In May 2021, the trial court entered an order granting the summary judgment motion.

In June 2021, the trial court entered a final judgment incorporating the two summary judgment orders and the order awarding attorneys' fees, costs, and expenses. Anders filed a motion for new trial, which was denied by operation of law. This appeal followed.

## Standard of Review

We review grants of summary judgment de novo. *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 481 (Tex. 2015). For a traditional summary judgment motion, a movant has the burden to establish that no genuine issues of material fact exist and the movant is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co., Inc.*, 690 S.W.2d 546, 548 (Tex. 1985). If the movant satisfies this burden, the nonmovant then bears the burden of demonstrating a genuine issue of material fact to avoid summary judgment. *Lujan v. Navistar, Inc.*, 555 S.W.3d 79, 84 (Tex. 2018). In deciding whether a disputed material fact issue precludes summary judgment, we take as true evidence favorable to the nonmovant and indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Valance Oper. Co v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).

–7–

## Breach of Guaranty Agreements

In his first issue, Anders asserts the trial court erred in granting summary judgment in favor of CrossFirst on its claim for breach of the guaranty agreements because (1) CrossFirst failed to conclusively establish that its collection and disposition of collateral securing the underlying loans was commercially reasonable and (2) the only summary judgment evidence supporting the amount of CrossFirst's purported damages for the claim was deficient and conclusory.

When a debtor defaults on an obligation, a secured party, like CrossFirst, may take possession of collateral, dispose of it, and apply the proceeds to help satisfy the debtor's obligation. *See* Tex. Bus. & Com. Code Ann. §§ 9.609, 9.610, 9.615; *Regal Fin. Co. v. Tex. Star Motors, Inc.*, 355 S.W.3d 595, 596–97 (Tex. 2010). Chapter 9 of the Uniform Commercial Code (UCC) requires a secured party that undertakes to collect and dispose of collateral to proceed in a "commercially reasonable" manner. Bus. & Com. §§ 9.607(c)(1), 9.610(a), (b), 9.627; *Regal Fin. Co.*, 355 S.W.3d at 597, 599. If, as in this case, the debtor places the secured party's compliance with chapter 9 in issue, the secured party must prove compliance, including that the collection and disposition of collateral was commercially reasonable.[2] Bus. & Com. § 9.626(a); *Jantzen v. Am. Nat'l Bank of Tex., N.A.*, 300

---

[2] To recover for the deficiency on a secured transaction, a secured party must prove the following elements: (1) the obligor executed a loan contract and security agreement specifying the collateral; (2) a default on the loan; (3) the obligor failed to repay the note despite notice and demand from the secured party; (4) the secured party foreclosed its security interest in the collateral and sold the collateral in a commercially reasonable manner; and (5) after disposition of the collateral, a deficiency existed, repayment

S.W.3d 412, 414–15 (Tex. App.—Dallas 2009, no pet.) (noting specific pleading requirement). A secured party's right to recover a deficiency is limited, but not eliminated, if it fails to prove its collection and/or disposition of collateral was commercially reasonable. BUS. & COM. § 9.626(a)(3); *Wilson v. Cap. Partners Fin. Grp. USA, Inc.*, No. 05-20-00704-CV, 2022 WL 2437595, at *7 (Tex. App.—Dallas July 5, 2022, no pet.)

Every aspect of a secured party's disposition of collateral after default, including the method, manner, time, place, and other terms, must be commercially reasonable. BUS. & COM. § 9.610(b). Chapter 9 provides several examples of commercially reasonable dispositions, which courts have referred to as "safe harbors." *Id.* § 9.627; *Regal Fin. Co.*, 355 S.W.3d at 599. A collection, enforcement, disposition, or acceptance is commercially reasonable if it has been approved in a judicial proceeding. BUS. & COM. § 9.627(c)(1). Other examples of commercially reasonable dispositions include dispositions made:

(1)     in the usual manner on any recognized market;

(2)     at the price current in any recognized market at the time of the disposition; and

(3)     otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition.

---

of which was required to make the secured party whole. *See McGee v. Deere & Co.*, No. 03-04-00222-CV, 2005 WL 670505, at *2 (Tex. App.—Austin Mar. 24, 2005, pet. denied.) (mem. op.) (citing BUS. & COM. §§ 9.610, 9.615). Anders has complained that CrossFirst failed to conclusively establish the collection and disposition of LO Transport collateral was commercially reasonable and the amount of the deficiency.

*Id.* § 9.627(b); *Regal Fin. Co.*, 355 S.W.3d at 599.[3]  "[C]ommercial reasonableness is a fact-based inquiry that requires a balance of . . . two competing policies: (1) protecting debtors against creditor dishonesty and (2) minimizing interference in honest dispositions." *Regal Fin. Co.*, 355 S.W.3d at 602.

In moving for summary judgment, CrossFirst first asserted that the collection and disposition of the LO Transport collateral was commercially reasonable as a matter of law because the trial court approved the manner of CrossFirst's disposition of the collateral.  The safe harbor for judicial approval may apply to sales "conducted under the supervision of a court or court-appointed officer or subsequently reviewed and approved by a court." *Palestine Water Well Serv., Inc. v. Washington Int'l Ins. Co.*, No. DR:15-CV-016-AM-CW, 2015 WL 12910046, at *16 (W.D. Tex. Sept. 30, 2015) (citing *Baragas v. Coupland State Bank*, No. 03-01-00098-CV, 2001 WL 1509972, at *7 (Tex. App.—Austin Nov. 29, 2001, no pet.)).  And, in this case, the trial court pre-authorized the sale of the receivership collateral, including several aspects of the auction.

However, the trial court, per its authorization order, also anticipated entering a final order to confirm the sale, and the record contains no such order.   Further,

---

[3] Courts also consider the following factors when assessing commercial reasonableness:  (1) whether the secured party endeavored to obtain the best price possible; (2) whether the collateral was sold in bulk or piecemeal; (3) whether it was sold via private or public sale; (4) whether it was available for inspection before the sale; (5) whether it was sold at a propitious time; (6) whether the expenses incurred during the sale were reasonable and necessary; (7) whether the sale was advertised; (8) whether multiple bids were received; (9) what state the collateral was in; and (10) where the sale was conducted. *Regal Fin. Co.*, 355 S.W.3d at 601–02; *see* BUS. & COM. § 9.627 cmt. 3.

–10–

Anders primarily challenged CrossFirst's conduct in collecting LO Transport collateral in late September and early October 2018,[4] prior to Jackson's appointment as a receiver and even his involvement as a consultant to CrossFirst. Under these circumstances, we cannot conclude that the safe harbor for judicial approval of a sale applies to establish commercial reasonableness as to all of CrossFirst's collection efforts as a matter of law. *See*, *e.g.*, *Palestine Water Well Serv.*, 2015 WL 12910046, at *17 (section 9.627(c) did not apply, and summary judgment was inappropriate, when, although trial court approved settlement agreement stating that collateral would be disposed of in a commercially reasonable fashion, there was no evidence the court looked at the value or merits of the collateral, a commercial tort claim, before signing off on the settlement agreement).

CrossFirst next asserted that, even if the safe harbor for judicial approval does not apply, there is no genuine fact issue concerning commercial reasonableness because its motion for summary judgment was supported by the detailed declarations of Jackson and David Payne, a court-approved marketing agent, explaining their

---

[4] In one regard, Anders complained about the auction proceeds. According to Anders, the fact that the auction proceeds ($912,221) were substantially lower than a forced liquidation valuation of the collateral ($1,426,000) called into question whether the collection and disposition efforts were commercially reasonable. The fact that a greater amount could have been obtained, however, "is not of itself sufficient to preclude the secured party from establishing that the collection, enforcement, disposition, or acceptance was made in a commercially reasonable manner." BUS. & COM. § 9.627(a); *Williams v. Energy Cap. Credit Union*, No. 01-20-00060-CV, 2021 WL 3869750, at *4 (Tex. App.—Houston [1st Dist.] Aug. 31, 2021, no pet.) (mem. op.) (citing *Regal Fin. Co.*, 355 S.W.3d at 602, and noting that a "satisfactory price is not necessarily the highest price"). And, although, a court should carefully scrutinize all aspects of a disposition, including a low price, to insure each was commercially reasonable, *see Lister v. Lee-Swofford Invs., L.L.P.*, 195 S.W.3d 746, 748 (Tex. App.—Amarillo 2006, no pet.), Anders did not proffer any other summary judgment evidence to show the collateral sold at auction brought unreasonably low bids.

processes for collecting, preparing, and disposing of the collateral at auction. Beginning in late October 2018, they worked to identify, inventory, and secure the collateral as CrossFirst consultants. As receiver, Jackson submitted four reports to the trial court, and Anders raised no objections to the reports.

As discussed above, however, Anders complained of CrossFirst's conduct beginning in late September and/or early October 2018. The summary judgment evidence shows Nichols visited the yard without Collura's consent, excluded Collura from meetings, and met instead with Gayanich, the recently-hired yard manager. Another LO Transport employee, Jason Stromberg, overheard Nichols and Gayanich discuss "taking over the company" and "push[ing]" out Collura. According to Stromberg, Nichols told Gayanich to "do whatever it takes."

CrossFirst locked the yard, and Gayanich, at Nichols's request, began contacting LO Transport's customers to tell them the bank now owned equipment stored at the yard. LO Transport customers were prohibited from entering to retrieve equipment they owned. According to Collura, these actions "absolutely crushed" LO Transport's business.

Additionally, just days before the Chapter 7 petition was filed and while LO Transport employees were helping CrossFirst confirm that everything LO Transport owned was in the yard, Gayanich removed equipment from the yard to his own property. The equipment included an oil pot, a flat-bed trailer, a bucket for a front-end loader, a storage container, and a shop toolbox. Stromberg testified the

–12–

equipment was worth tens of thousands of dollars. Gayanich said both Nichols and Collura knew he was removing the equipment, but both denied it. Stromberg never saw the equipment returned to the yard. Two trucks also were stolen from the yard; one was recovered with some damage, but the other was not recovered.

According to CrossFirst, Anders agreed in the loan and security agreement that, in the event of default, CrossFirst would have the right to require LO Transport to assemble collateral at a convenient location, sell or otherwise dispose of the collateral, and retain the collateral in satisfaction of the debt. LO Transport also authorized CrossFirst to direct any person owing money to LO Transport to pay such sums directly to CrossFirst. To recover its deficiency, however, CrossFirst had the burden to establish the collection and disposition was done in a commercially reasonably manner. We conclude Anders has proffered summary judgment evidence, including evidence regarding Nichols's reliance on Gayanich and the safeguarding of LO Transport equipment, that raises a fact issue on the commercial reasonableness of CrossFirst's efforts to collect collateral.

Accordingly, we conclude that CrossFirst failed to establish commercial reasonableness as a matter of law. Because there remains a fact issue as to commercial reasonableness and, as a result, the amount of the deficiency CrossFirst may be entitled to as damages, *see* BUS. & COM. § 9.626(a)(3), the trial court erred

in granting summary judgment on CrossFirst's claim for breach of the guaranty agreements.[5]  We sustain Anders's first issue.

Because CrossFirst failed to conclusively establish commercial reasonableness and prevail on its deficiency claim, we also reverse the trial court's award of expenses related to the collection and disposition of collateral.  Indeed, whether such expenses are reasonable and necessary is a factor in assessing commercial reasonableness.  *See Regal Fin. Co.*, 355 S.W.3d at 602.  We, therefore, need not consider Anders's arguments challenging the award of expenses under his second issue.

To recover attorneys' fees, costs, and expenses for prosecuting its breach of guaranties claim against Anders, CrossFirst had to prevail on the claim and recover damages.  *See Ventling v. Johnson*, 466 S.W.3d 143, 154 (Tex. 2015); TEX. CIV. PRAC. & REM. CODE ANN. § 38.001.  As discussed above, fact issues remain as to commercial reasonableness and damages.  Accordingly, we must reverse the trial court's award to CrossFirst on its claim for attorneys' fees, costs, and expenses.

Reversal of the award of attorneys' fees, expenses, and costs also is required for another reason.  CrossFirst submitted heavily redacted billing records, along with declarations by its attorney, in support of its claim for attorneys' fees.  Anders responded that, due to the heavy redactions, it was impossible to determine whether

---

[5] Given this conclusion, we need not reach Anders's argument that CrossFirst failed to submit sufficient evidence to establish as a matter of law that it was entitled to a deficiency of $3,319,921.88.  *See* TEX. R. APP. P. 47.1.

–14–

the hours reflected in the billing records were expended reasonably and, therefore, CrossFirst did not meet its burden to establish the reasonableness and necessity of the fees. At a short hearing on CrossFirst's motion, Anders again objected to the redactions, arguing they were so significant that it was impossible to determine whether the fees were reasonable in order to provide controverting evidence. At the close of the hearing, the trial court directed CrossFirst to submit unredacted versions of the records for an in camera review. Thereafter, the trial court entered an order awarding, among other fees, costs, and expenses, $279,429.53 in reasonable and necessary attorneys' fees in prosecuting its claim against Anders through September 30, 2020.[6]

"[C]lear, direct, and uncontroverted evidence, even evidence from an interested witness, will establish that attorney's fees sought are reasonable, necessary, and credible, *where the opposing party had means and opportunity to disprove the testimony but failed to do so*." *Cleveland v. Taylor*, 397 S.W.3d 683, 701 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (emphasis added) (citing *Smith v. Patrick W.Y. Tam Trust*, 296 S.W.3d 545, 547–48 (Tex. 2009)); *Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 882 (Tex. 1990) (per curiam)

---

[6] CrossFirst asserts that Anders waived any complaint about the trial court's award of attorneys' fees because he did not object to the trial court's decision to review the records in camera. We disagree. The trial court stated that she wanted to review the unredacted records, which she typically does because of her interpretation of *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469 (Tex. 2019), and take the time to read Anders's response and review his objections. Based on this statement, Anders reasonably could expect that the trial court would rule on his redaction objections and give him the opportunity to present controverting evidence prior to entering an order awarding fees.

(acknowledging need for party opposing fees request to have "the means and opportunity of disproving the testimony"); *see also* TEX. R. CIV. P. 192.3(e) (authorizing discovery, among other things, of "the facts known by the expert that relate to or form the basis of the expert's mental impressions and opinions"). Because the unredacted billing records were reviewed and relied upon by CrossFirst's counsel in support of his testimony, as well as by the trial court in determining the fee awarded, Anders was entitled to review them in order to controvert the expert opinion of CrossFirst's counsel.

Accordingly, we conclude the trial court abused its discretion in awarding the attorneys' fees, costs, and expenses without first providing Anders with an opportunity to review and controvert the billing records. *See Kubbernus v. ECAL Partners, Ltd.*, 574 S.W.3d 444, 486 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (trial court's award of attorneys' fees reviewed for abuse of discretion). For this reason, we sustain Anders's third issue and need not address his remaining arguments challenging the attorneys' fees award.

## Breach of Fiduciary Duty

In his fourth issue, Anders contends the trial court erred in granting summary judgment in favor of CrossFirst on his breach of fiduciary duty counterclaim. Specifically, he asserts that CrossFirst did not meet its burden of conclusively establishing that CrossFirst was not a fiduciary to Anders.

To prevail on a breach of fiduciary duty claim, a plaintiff must establish, among other elements, a fiduciary relationship between the plaintiff and the defendant. *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied). Such a relationship "exists when the parties are under a duty to act for or give advice for the benefit of another upon matters within the scope of the relationship." *Tex. Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 507 (Tex. 1980) (citation omitted). A formal fiduciary relationship, such as between partners, arises as a matter of law. *Crim Truck & Tractor v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 593–94 (Tex. 1992), *superseded by statute on other grounds as recognized in Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 225–26 (Tex. 2002).

Here, Anders argues CrossFirst owed him fiduciary duties because, as a result of its actions during October 2018, "when its employees and agents took control of LO Transport's operations," it became a de facto partner in LO Transport's business. The loan and security agreement, however, explicitly defined the parties' relationship as that of debtor and creditor and disclaimed any fiduciary relationship:

> **Lender Not Fiduciary:** The relationship between Obligors and Lender is solely that of debtor and creditor, and ***Lender has no fiduciary or other special relationship with any Obligor***, and no term or condition of any of the Loan Documents shall be construed so as to deem the relationship between any Obligor and Lender ***to be other than that of debtor and creditor.***

(emphasis added).

–17–

Anders clearly takes issue with the manner in which CrossFirst first exercised control over the collateral. CrossFirst nevertheless was acting within its rights as a creditor pursuant to the loan and security agreement. Specifically, the agreement authorized CrossFirst, among other things, to (1) exercise "all the rights and remedies of a secured party" under the UCC; and (2) require LO Transport to assemble the collateral as directed by CrossFirst and make it available to CrossFirst at a place designated by CrossFirst. *See also* BUS. & COM. §§ 9.609 (providing that, after default, "a secured party . . . may take possession of the collateral").

The supreme court recognizes the importance of honoring parties' contractual terms defining the scope of their obligations and agreements, including limiting fiduciary duties that might otherwise exist, especially in arms-length business transactions, as in this case, in which the parties are experienced negotiators. *E.g., Nat'l Plan Adm'rs, Inc. v. Nat'l Health Ins. Co.*, 235 S.W.3d 695, 703 (Tex. 2007). By signing the loan and security agreement, Anders expressly agreed that CrossFirst's conduct related to the agreement, which included its actions with respect to taking possession of the collateral, did not create a fiduciary duty. *See, e.g., Stephens v. Three Finger Black Shale P'ship*, 580 S.W.3d 687, 717 (Tex. App.—Eastland 2019, pet. denied) (holding any fiduciary duty that might have existed as a result of an alleged partnership was expressly disclaimed in contract and thus no recovery could be had relating to those alleged fiduciary duties); *Strebel v. Wimberly*, 371 S.W.3d 267, 283–85 (Tex. App.—Houston [1st Dist.] 2012 pet.

denied) (holding trial court erred by entering judgment on jury's breach of fiduciary duty finding where "fiduciary duties have been expressly disclaimed" in contract).

Taking as true all evidence favorable to Anders, we conclude that CrossFirst conclusively established that it had no fiduciary relationship with Anders and, therefore, was entitled to judgment as a matter of law. Accordingly, the trial court properly granted summary judgment that Anders take nothing on his breach of fiduciary duty counterclaim. We overrule Anders's fourth issue.

## Conclusion

We affirm the trial court's judgment in part and reverse in part. We affirm the judgment to the extent that it granted summary judgment in CrossFirst's favor on Anders's breach of fiduciary duty counterclaim against CrossFirst. We reverse the judgment to the extent it granted summary judgment in CrossFirst's favor on its breach of the guaranty agreements claim against Anders and awarded attorneys' fees, costs, and expenses to CrossFirst on that claim. We remand the case to the trial court for further proceedings in accordance with this opinion.

/Craig Smith/
CRAIG SMITH
JUSTICE

210769F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

LARRY K. ANDERS, Appellant

No. 05-21-00769-CV     V.

CROSSFIRST BANK, A KANSAS
STATE BANK, Appellee

On Appeal from the 429th Judicial
District Court, Collin County, Texas
Trial Court Cause No. 429-05551-
2018.
Opinion delivered by Justice Smith.
Justices Reichek and Goldstein
participating.

In accordance with this Court's opinion of this date, we **AFFIRM** in part and **REVERSE** in part the trial court's judgment. We **AFFIRM** the trial court's judgment in appellee CrossFirst Bank's favor on appellant Larry K. Anders's breach of fiduciary duty counterclaim. We **REVERSE** the trial court's judgment on CrossFirst Bank's breach of the guaranty agreements claim, including the award of attorneys' fees, costs, and expenses on that claim. We **REMAND** this cause to the trial court for further proceedings consistent with this opinion.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 19th day of December 2022.